Filing # 131525087 E-Filed 07/27/2021 05:07:43 PM

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT IN AND FOR
HILLSBOROUGH COUNTY, FLORIDA, CIVIL ACTION

YVONNE OKEKE, individually,

      Plaintiff(s).

vs.

LUX PHARMA HOLDINGS, LLC, a Wyoming
limited liability company,

      Defendant(s).

CASE NO.:

## COMPLAINT

**COMES NOW**, the Plaintiff(s), YVONNE OKEKE, individually ("Plaintiff(s)"), sues the Defendant(s),

LUX PHARMA HOLDINGS, LLC, a Wyoming limited liability company ("Defendant(s)"), and in support

thereof further alleges the following:

### JURISDICTION, VENUE, AND PARTIES

1. This is an action for money damages which exceed $30,000.00, exclusive of Attorney's Fees and Costs.

2. This Court has jurisdiction over the subject matter of this dispute as services provided through the
   underlying contract(s) were provided in Hillsborough County.

3. Venue is proper in Hillsborough County, Florida; inasmuch as the events from which these causes of
   actions arose occurred in Hillsborough County, Florida.

4. Plaintiff(s), YVONNE OKEKE, individually, is a citizen of the State of Florida, over the age of eighteen
   (18) and, at all times relevant hereto, is a resident of Hillsborough County, Florida and is otherwise *sui
   juris*.

5. At all times material hereto, upon information and belief, Defendant(s), LUX PHARMA HOLDINGS, LLC,
   was and still is a foreign corporation organized and existing under the laws of the State of Wyoming,
   doing business in the state of Florida and has submitted itself to personal jurisdiction of this Court
   pursuant to Florida's long-arm statute, Florida Statute ("Fla. Stat.") § 48.193(1)(a)(1) by operating,
   conducting, engaging in, or carrying on a business or business venture in this state or having an
   office or agency in this state; and/or under Fla. Stat. § 48.193(1)(a)(7) by breaching a contract in this
   state by failing to perform acts required by the contract to be performed in this state.

1

## GENERAL ALLEGATIONS

6. On or about March 26, 2012, Articles of Organization were filed with the Florida Department of State for YVONNE ENTERPRISES, LLC, a Florida limited liability company D/B/A KAY PHARMACY (the "COMPANY").

7. Upon formation of the COMPANY, Plaintiff(s), YVONNE OKEKE, individually ("OKEKE"), was the sole Manager thereof owning One Hundred Percent 100% of the membership interest in and to the COMPANY.

8. On or about August 14, 2020, OKEKE, entered into a Membership Interest Purchase Agreement, as amended, *see* Exhibit "A", with Defendant(s), LUX PHARMA HOLDINGS, LLC ("LUX")(collectively, the "Parties"), whereby OKEKE agreed to sell, and LUX agreed to buy, all of OKEKE's rights, title and interest in and to her Membership Interest of the COMPANY for valuable consideration.

9. In connection therewith the transaction was further memorialized by the execution of a Secured Promissory Note (Exhibit "B") whereby LUX agreed to pay OKEKE the balance owed; a Security Agreement (Exhibit "C"); a Membership Interest Pledge Agreement (Exhibit "D"); a Bill of Sale (Exhibit "E"); *inter alia.*

10. The consideration to be paid by LUX to OKEKE was as follows:

      i. $250,000.00 (the "Cash Portion");

      ii. $124,474.13 (the "Pay-Off Portion" of the mortgage note owed by the COMPANY for the Property located at 637 1st Street S., Winter Haven, Florida 33880);

      iii. $165,525.87 (the principal amount secured by the assets of LUX); and

      iv. The payment of Accounts Receivable from the COMPANY by LUX to OKEKE.

11. The Cash Portion and Pay-Off Portion (the "Closing Purchase Price") totaling, $374,474.13, was paid by LUX to OKEKE at closing of the transaction.

12. The principal amount of $165,525.87 secured by the assets of LUX matured and became due and owing on December 7, 2020, which remains unpaid, outstanding, and immediately due and payable.

13. The Accounts Receivable remain unpaid, outstanding, and immediately due and payable.

14. All conditions precedent to the filing of this action have occurred, been performed, or have been waived.

15. OKEKE has retained the undersigned law firm to represent her in this matter and is obligated to pay a

2

reasonable fee for their services.

### COUNT I - BREACH OF MEMBERSHIP INTEREST PURCHASE AGREEMENT (UNPAID PRINCIPAL)

16. OKEKE re-alleges, restates, and reincorporates paragraphs 1-15 above as if set forth herein.

17. The Parties executed a Membership Interest Purchase Agreement, as amended, *see* Exhibit "A", whereby as part of the Total Purchase Price for OKEKE's Membership Interest, LUX agreed to sign a "secured note amended to reflect the principal amount of $165,525.87 secured by the assets of [LUX], including a pledge of the Membership Interests (the "Note")."

18. OKEKE is the holder of the Note.

19. Pursuant to the terms of the Note, *see* Exhibit "B", the pay-off amount of $165,525.87, is not subject to any adjustments ("Pay-Off Amount").

20. Accordingly, the Pay-Off Amount under the Membership Interest Purchase Agreement, as amended, secured by the Note matured and became "fully due and payable on December 7, 2020."

21. LUX breached its obligations under the Membership Interest Purchase Agreement, as amended, secured by the Note by failing to tender the Pay-Off Amount to OKEKE and is now in default.

22. The entire balance of the Pay-Off Amount remains due, outstanding, and delinquent.

23. OKEKE has incurred damages as a direct consequence of LUX's breach.

24. Pursuant to the terms of the Membership Interest Purchase Agreement, as amended, the Pay-Off Amount of $165,525.87 is now immediately due and payable with interest.

25. The Membership Interest Purchase Agreement, as amended, obligates LUX to pay OKEKE's attorneys' fees under these circumstances.

**WHEREFORE,** Plaintiff, YVONNE OKEKE, individually, respectfully requests that this Honorable Court enter judgment against the assets of Defendant, LUX PHARMA HOLDINGS, LLC, for the amount of $165,525.87, plus interest, and for any and all other relief this Court deems just and proper under the circumstances, including the award of Attorneys' Fees and Court Costs.

### COUNT II - BREACH OF PROMISSORY NOTE

26. OKEKE re-alleges, restates, and reincorporates paragraphs 1-25 above as if set forth herein.

27. The Parties executed a Membership Interest Purchase Agreement, as amended, *see* Exhibit "A", whereby as part of the Total Purchase Price for the OKEKE's Membership Interest, LUX agreed to sign a "secured note

3

amended to reflect the principal amount of $165,525.87 secured by the assets of [LUX], including a pledge of the Membership Interests (the "Note")."

28. OKEKE is the holder of the Note.

29. Pursuant to the terms of the Note, *see* Exhibit "B", the pay-off amount of $165,525.87, is not subject to any adjustments.

30. Accordingly, the Pay-Off Amount under the Membership Interest Purchase Agreement, as amended, secured by the Note matured and became "fully due and payable on December 7, 2020."

31. LUX breached its obligations under the Membership Interest Purchase Agreement, as amended, secured by the Note by failing to tender the Pay-Off Amount to OKEKE and is now in default.

32. The entire balance of the Pay-Off Amount remains due, outstanding, and delinquent.

33. OKEKE has incurred damages as a direct consequence of LUX's breach.

34. Pursuant to the terms of the Secured Promissory Note, the Pay-Off Amount of $165,525.87 is now immediately due and payable with interest.

35. The Secured Promissory Note obligates LUX to pay OKEKE's attorneys' fees under these circumstances.

**WHEREFORE**, Plaintiff, YVONNE OKEKE, individually, respectfully requests that this Honorable Court enter judgment against the assets of Defendant, LUX PHARMA HOLDINGS, LLC, for the amount of $165,525.87, plus interest, and for any and all other relief this Court deems just and proper under the circumstances, including the award of Attorneys' Fees and Court Costs.

### COUNT III – BREACH OF MEMBERSHIP INTEREST PURCHASE AGREEMENT (ACCOUNTS RECEIVABLE)

36. OKEKE re-alleges, restates, and reincorporates paragraphs 1-35 above as if set forth herein.

37. The Membership Interest Purchase Agreement, as amended, provides for the payment of Accounts Receivable from the COMPANY by LUX to OKEKE.

38. Pursuant to Article VII, Section 7.10 of the Membership Interest Purchase Agreement, as amended, *see* Exhibit "A":

> **"Accounts Receivable"** means the balance of money due to the Company for goods or services delivered or used but not yet paid for by customers, including purchases made on credit."

39. Pursuant to Article IV, Section 4.4 of the Membership Interest Purchase Agreement, as amended, *see* Exhibit

"A";

"'**Accounts Receivable; Reconciliation.** The Company's Accounts Receivable as of the end of the business day on the Closing Date (the "**Pre-Closing AR**") will be paid weekly within three (3) business days of receipt by the Company for at least one year from the Closing Date. As promptly as practicable following the end of each week after the Closing Date for up to one year after the Closing Date.''

40. Pursuant to Paragraph 6(b) of the First Amendment to Membership Interest Purchase Agreement, as amended, *see* Exhibit "A":

"The Parties acknowledge that the Seller is entitled to the Company's accounts receivable for products sold, prescriptions issued, and services rendered before August 19, 2020."

41. LUX breached its obligations by failing to pay Accounts Receivable owed to OKEKE and is now in default.

42. OKEKE has incurred damages as a direct consequence of LUX's breach.

43. The Membership Interest Purchase Agreement, as amended, obligates LUX to pay OKEKE's attorneys' fees under these circumstances.

**WHEREFORE**, Plaintiff, YVONNE OKEKE, individually, respectfully requests that this Honorable Court enter judgment against Defendant, LUX PHARMA HOLDINGS, LLC, for the outstanding Accounts Receivable, plus interest, and for any and all other relief this Court deems just and proper under the circumstances, including the award of its Attorneys' Fees and Court Costs.

## COUNT IV - BREACH OF MEMBERSHIP INTEREST PLEDGE AGREEMENT

44. OKEKE re-alleges, restates, and reincorporates paragraphs 1-43 above as if set forth herein.

45. The Parties executed a Membership Interest Pledge Agreement, *see* Exhibit "D", whereby LUX agreed that in order "[t]o secure the performance of all obligations in your [OKEKE's] favor under the Purchase Agreement and each of the other Loan Documents, the undersigned [LUX] here by pledges to you [OKEKE], and grants you [OKEKE] a security interest in and to:

(1) 100 percent of the Membership Interest (the "Interests"), of VYONNE ENTERPRISES LLC; and

(2) Any other "Collateral" (as hereinafter defined) whether now owned or hereafter acquired by Pledgor, whether now or hereafter existing or arising and wherever located. The term "Collateral", as used in this Agreement, means the Interests and any cash, securities or other property paid or otherwise distributed on, with respect to, or in exchange for the Interests or any other Collateral as well as all of our rights and privileges with respect to such Collateral. If we receive such other Collateral, we will promptly deliver the same to you in the form received."

5

46. LUX breached its obligations under the Membership Interest Pledge Agreement by failing to tender Accounts Receivable and the Pay-Off Amount to OKEKE, and is now in default.

47. Outstanding Accounts Receivable and the entire balance of the Pay-Off Amount remain due and delinquent.

48. Pursuant to the Membership Interest Pledge Agreement:

> "Upon the occurrence and during the continuance of any Event of Default under the Purchase Agreement, without notice to us [LUX]: (a) you [OKEKE] will be entitled to vote the Interests and any other Collateral held by you [LUX] under this Agreement, and at all such times we [LUX] will not be entitled to vote the Interests or any other Collateral and (b) you [OKEKE] may take such action as you [OKEKE] deem advisable with respect to the Collateral, including, without limitation, transferring any of the Collateral into your name [OKEKE] or the name of your nominee, and selling any of the Collateral at a public or private sale on such terms as you [OKEKE] Deem appropriate. At any such sale you [OKEKE] may be the purchaser.
>
> You [OKEKE] will not be required to resort to or pursue any of your rights or remedies under or with respect to any other security for, or guaranty of payment of, any of the obligations secured by this Agreement before pursuing any of your rights or remedies under this Agreement."

49. OKEKE has incurred damages as a direct consequence of LUX's breach.

50. Pursuant to the terms of the Membership Interest Pledge Agreement, outstanding Accounts Receivable and the Pay-Off Amount of $165,525.87 are now immediately due and payable with interest.

**WHEREFORE**, Plaintiff, YVONNE OKEKE, individually, respectfully requests that this Honorable Court enter judgment against the assets and collateral of Defendant, LUX PHARMA HOLDINGS, LLC, for the damages incurred, plus interest, and/or transfer 100% of its membership interest in YVONNE ENTERPRISES LLC to Plaintiff, and for any and all other relief this Court deems just and proper under the circumstances, including the award of Attorneys' Fees and Court Costs.

## COUNT V – UNJUST ENRICHMENT

51. OKEKE re-alleges, restates, and reincorporates paragraphs 1-50 above as if set forth herein.

52. OKEKE has conferred a benefit on LUX, who has knowledge thereof.

53. LUX voluntarily accepted and retained the benefit conferred.

54. The circumstances render LUX's retention of the benefit inequitable unless LUX pays to OKEKE the value of the benefit.

55. LUX has been unjustly enriched at the expense of OKEKE.

56. OKEKE is entitled to damages as a result of LUX's unjust enrichment.

**WHEREFORE,** Plaintiff, YVONNE OKEKE, individually, demands monetary damages against Defendant, LUX PHARMA HOLDINGS, LLC, for unjust enrichment and such other relief this Court deems just and proper, including interest, Attorneys' Fees and Costs.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 27, 2021, a copy of the foregoing has been electronically filed with the Clerk of Courts by way of the CM/ECF system.

**LEGAL ADVOCATES, PLLC**

/s/
_____

Erik T. Silevitch, Esquire (FBN 92048)
2424 N. Federal Hwy
Suite 411
Boca Raton, FL 33431
Tel: 561-666-3443
Fax: (561) 444-0185
Primary Service Address: Service@inyourinterest.net

DocuSign Envelope ID: 86420FC2-52AE-43F8-9F0F-453C00216480

EXHIBIT "A"

MEMBERSHIP INTEREST PURCHASE AGREEMENT BY AND AMONG

YVONNE OKEKE

YVONNE ENTERPRISES LLC

And

LUX PHARMA HOLDINGS, LLC

Dated as of August 14, 2020

DocuSign Envelope ID: 86420FC2-52AE-43F6-9F0F-453C00216489

EXHIBIT "A"

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "**Agreement**") is made and entered into as of August 14, 2020 among YVONNE OKEKE ("**Seller**"), YVONNE ENTERPRISES LLC, a Florida limited liability company D/B/A KAY PHARMACY ("**Company**") and LUX PHARMA HOLDINGS, LLC, a Wyoming limited liability company ("**Buyer**").

## RECITALS

WHEREAS, Buyer desires to acquire from Seller all of the limited liability company membership interests (the "**Membership Interests**") of the Company, upon the terms and subject to the conditions set forth in this Agreement; and

WHEREAS, Seller desires to sell the Membership Interests to Buyer upon the terms and subject to the conditions of this Agreement.

WHEREAS, capitalized terms used but not defined in the context of the Section in which such terms first appear shall have the meanings set forth in Section 7.10..

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I. PURCHASE AND SALE OF MEMBERSHIP INTERESTS

Section 1.1. **Purchase and Sale of Membership Interests.** Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, Seller shall sell to Buyer, and Buyer shall purchase from Seller, all of Seller's rights, title and interest in and to the Membership Interests, free and clear of all liens, claims and encumbrances of any nature whatsoever (collectively, "**Liens**").

Section 1.2 **Purchase Price.**

(a) *Total Purchase Price.* The purchase price for the Membership Interests (the "**Purchase Price**") shall be equal to (i) $250,000.00 (the "**Cash Portion**"), (ii) $124,474.13 the pay-off value of the mortgage note owed by the Company for the Property pursuant to the Pay-Off Letter provided by the holder of the mortgage note (the "**Pay-off Portion**") (collectively with the Cash Portion the "**Closing Purchase Price**"), and (iii) plus a secured note in the principal amount of $175,525.87 secured by the assets of the Buyer, including a pledge of the Membership Interests, subject to adjustments due and payable within 180 days of the Closing Date, in substantially the form attached as Exhibit A (the "**Note**").

(b) *Closing Purchase Price Payment.* The Closing Purchase Price will be paid on the Closing Date by means of wire transfer in immediately available funds in accordance with the funds flow memorandum set forth on Schedule 1.2(b).

(c) *Note.* Buyer will deliver the Note, provided that the pay-off amount of the Note will be the lesser of (i) $175,525.87 and any accrued interest, and (ii) (A) the difference of (Y) the amount of the Appraised Value of the Property (Z) minus the Pay-off Portion, provided that the Appraised Value of the Property will not exceed $300,000.00 for the purposes of this Section 1.2(c) (the "**Net Property Value Price**").

## ARTICLE II. REPRESENTATIONS AND WARRANTIES OF SELLER AND THE COMPANY.

Seller and the Company hereby represent and warrant to Buyer as follows:

Section 2.1. **Organization and Power.** The Company is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Florida and has all power and authority necessary to own or lease its properties and assets and to carry on its business as currently conducted. The Company is duly qualified or licensed to do business and is in good standing in each of the jurisdictions in which the character of the properties owned or held under lease by it or the nature of the business transacted by it makes such qualification necessary, except where

DocuSign Envelope ID: 86420FC2-52AE-43F6-9F0F-153C00216489

EXHIBIT "A"

the failure to be so qualified or in good standing when taken together with all other such failures, has not, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 2.2. Capitalization.

(a) The authorized capital of the Company consists of membership interests. At the close of business on the Business Day immediately preceding the date of this Agreement, 100% of the Membership Interests were issued and outstanding.

Section 2.3.  Authorization. Each of the Seller and the Company has the requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby and to perform its obligations hereunder. The execution, delivery and performance by the Seller and the Company of this Agreement, and the consummation by the Seller and the Company of the transactions contemplated hereby, have been duly and validly authorized by the Company Managers and no other proceedings on the part of the Seller and the Company are necessary to authorize this Agreement or to consummate the transactions contemplated hereby or to perform the respective obligations of the Seller and Company hereunder. This Agreement has been duly and validly executed and delivered by the Seller and the Company and, assuming this Agreement constitutes the legal, valid and binding agreement of Buyer, constitutes a legal, valid and binding agreement of the Seller and the Company, enforceable against the Seller and the Company in accordance with its terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws, now or hereafter in effect, affecting creditors' rights generally and by general principles of equity.

Section 2.4. Non-Contravention; Filings and Consents.

(a) The execution, delivery and performance by the Seller and the Company of this Agreement and the consummation by the Seller and the Company of the transactions contemplated hereby do not and will not (with or without notice or lapse of time, or both):

(1) contravene, conflict with, or result in any violation or breach of any provision of the articles of organization or operating agreement of the Company;

(2) contravene, conflict with or result in a violation or breach of any provision of any applicable Law or Order;

(3) require any consent or approval under, violate, conflict with, result in any breach of or any loss of any benefit under, or constitute a change of control or default under, or result in termination or give to others any right of termination, vesting, amendment, acceleration or cancellation of any contract to which the Company or any Subsidiary of the Company is a party, or by which they or any of their respective properties or assets may be bound or affected or any Governmental Authority affecting, or relating in any way to, the property, assets or business of the Company; or

(4) result in the creation or imposition of any Lien on any asset of the Company.

(b) The execution, delivery and performance of this Agreement by the Seller and the Company and the consummation of the transactions contemplated hereby by the Seller and the Company do not and will not require any consent, approval, authorization or permit of, action by, filing with or notification to, any Governmental Authority, other than (i) and (ii) any actions or filings the absence of which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. For purposes of this Agreement, **"Governmental Authority"** means any national, state or local, domestic or foreign or international, government or any judicial, legislative, executive, administrative or regulatory authority, tribunal, agency, body, entity or commission or other governmental, quasi-governmental or regulatory authority or agency, domestic or foreign or international.

Section 2.5. Properties.

(a) The Company has good and marketable title to, or in the case of leased tangible assets, valid leasehold interests in, all of the real property and tangible assets used in the conduct of its business and all such property and assets,

DocuSign Envelope ID: 86420FC2-52AE-43F8-9F0F-453C00216489

EXHIBIT "A"

other than real property and assets in which the Company has leasehold interests, are free and clear of all Liens, except for Permitted Liens.

(b) With respect to the Property, neither the Company has subleased, licensed or otherwise granted anyone a right to use or occupy such Property or any portion thereof. The Company enjoys peaceful and undisturbed possession of the Property. The Property is in good condition and has been maintained in good repair in a manner consistent with standards generally followed with respect to similar properties, and satisfactorily serves the purposes for which it is used in the business of the Company.

**Section 2.6. Brokers; Certain Expenses.** Except for the Seller's and Company's agreement with Transworld Business Advisors, no agent, broker, investment banker, financial advisor or other firm or Person, other than those whose fees and expenses shall be paid entirely by the Seller, is or shall be entitled to receive any brokerage, finder's, financial advisor's, transaction or other fee or commission in connection with this Agreement or the transactions contemplated hereby based upon agreements made by or on behalf of the Seller or the Company.

**Section 2.7. No Litigation.** No claims have been asserted against the Company, either in pending or anticipated litigation or arbitration, and neither the Seller or the Company are aware of any potential claims or litigation.

### ARTICLE III. REPRESENTATIONS AND WARRANTIES OF BUYER.

Buyer represents and warrants to Seller as follows:

**Section 3.1. Organization.** Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the jurisdiction of its formation and has the requisite power to carry on its business as now conducted.

**Section 3.2. Authority for this Agreement.** Buyer has all necessary power and authority to enter into this Agreement and to consummate the transactions contemplated by this Agreement. The execution and delivery of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated hereby have been duly and validly authorized by all necessary action on the part of Buyer and no other proceedings on the part of Buyer are necessary to authorize this Agreement or to consummate the transactions contemplated by this Agreement. This Agreement has been duly executed and delivered by Buyer and, assuming due authorization, execution and delivery of this Agreement by Seller, constitutes a legal, valid and binding agreement of Buyer, enforceable in accordance with its terms against Buyer, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to creditors' rights generally and by general principles of equity.

**Section 3.3. Consents and Approvals.** The execution and delivery of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated hereby require no consent, approval, authorization or filing with or notice to any Governmental Authority, other than (i) compliance with any applicable foreign competition laws, compliance with any applicable requirements of Securities Act of 1933, as amended (the "Securities Act"), or the Securities and Exchange Act of 1934, as amended (the "Exchange Act") and any other U.S. state or federal securities laws; and (iii) any actions or filings the absence of which are not reasonably likely to prevent, materially delay or materially impair the ability of Buyer to consummate the transactions contemplated by this Agreement.

**Section 3.4. Non-Contravention.** The execution, delivery and performance of this Agreement by Buyer and the consummation of the transactions contemplated by this Agreement do not and will not (with or without notice or lapse of time or both) (i) contravene, conflict with, or result in any violation or breach of any provision of the certificate of formation or operating agreement of Buyer; (ii) assuming compliance with the matters referred to in <u>Section 3.3.</u>, contravene, conflict with or result in a violation or breach of any Law or Order; or (iii) require any consent or approval under, violate, conflict with, result in any breach of any loss of any benefit under, or constitute a change of control or default under, or result in termination or give to others any right of termination, vesting, amendment, acceleration or cancellation of any contract to which Buyer is a party, or by which its properties or assets may be bound or affected, with such exceptions, in the case of each of clauses (ii) and (iii) of this section, would not

Page 4

DocuSign Envelope ID: 86420FC2-52AE-43F6-9F0F-453C00216489

EXHIBIT "A"

reasonably be expected to prevent, materially delay or materially impair the ability of Buyer to consummate the transactions contemplated by this Agreement.

## ARTICLE IV. COVENANTS

Section 4.1. Non-Competition and Non-Solicitation.

(a) During the period commencing with the date of this Agreement and ending on the third anniversary of the Closing Date, Seller shall not, and shall cause its Affiliates not to, directly or indirectly, engage in, own, be employed by, consult with or otherwise render services to any Person who is engaged in any Competing Business; provided, however, that the ownership of an equity interest of not more than 2% in a publicly traded entity that is engaged in a Competing Business, without more, shall not constitute a violation of this covenant.

(b) If Seller shall be in breach of any of the provisions of subsection (a) above, then the time periods set forth in that subsection shall, as they relate to the breaching party, be extended by the length of time during which the breaching party is in breach of any of those provisions.

(c) As used in this Section 4.1., the following terms have the following meanings:

(1) "Competing Business" means a retail pharmacy.

(2) "Territory" means within 15 miles of the Property, in each case in which the Company or any of its Affiliates has marketed or sold any Products at any time during the three-year period immediately prior to the date of this Agreement.

(d) Seller acknowledges and agrees that the Company would be irreparably damaged if any of the provisions of this Section 4.1. are not complied with in accordance with their specific terms or are otherwise breached. Accordingly, it is agreed that Buyer and the Company shall be entitled to an injunction or injunctions to prevent breaches of this Section 4.1. and shall have the right to specifically enforce Section 4.1. and its terms and provisions against Seller in addition to any other remedy to which Buyer and the Company may be entitled under this Agreement, at law or in equity.

(e) It is the intent of the parties that each provision of this Section 4.1. be adjudicated valid and enforced to the fullest extent permissible under the laws and public policies of each jurisdiction in which adjudication of the validity or enforcement of Section 4.1. is sought. In furtherance of the foregoing, each provision of Section 4.1. shall be severable from each other provision, and any provision of Section 4.1. that is prohibited or unenforceable in any jurisdiction shall be subject to the following: (1) if the prohibited or unenforceable provision is contrary to or conflicts with any requirement of any statute, rule or regulation in effect in the jurisdiction, then the requirement shall be incorporated into, or substituted for, the prohibited or unenforceable provision to the minimum extent necessary to make the provision valid or enforceable; (ii) the Governmental Entity or arbitrator considering the matter is authorized to (or, if that Governmental Entity or arbitrator is unwilling or fails to do so, then the parties shall) amend the unenforceable provision to the minimum extent necessary to make the provision valid or enforceable, and the parties consent to the entry of an order amending the provision to that extent for that purpose; and (iii) if any unenforceable provision cannot be or is not reformed and made valid or enforceable under this Section 4.1., then the prohibited or unenforceable provision shall be ineffective in that jurisdiction to the minimum extent necessary to make the remainder of Section 4.1. valid or enforceable in that jurisdiction. Any application of the foregoing provisions to any provision of Section 4.1. shall not (x) affect the validity or enforceability of any other provision of Section 6.1. or (y) prevent the prohibited or unenforceable provision from being adjudicated valid or enforced as written in any other jurisdiction.

Section 4.2. Best Efforts; Government Filings. Subject to the terms and conditions of this Agreement, each of the Seller and Company will use their commercially reasonable efforts and Buyer shall use its best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable under applicable Law to consummate transactions contemplated by this Agreement, including (i) the obtaining of all necessary actions or nonactions, waivers, consents and approvals from

DocuSign Envelope ID: 88420FC2-52AE-43F6-9F0F-453C00216489

EXHIBIT "A"

Governmental Authorities and the making of all necessary registrations and filings (including filings with Governmental Authorities, if any) and the taking of all reasonable steps as may be necessary to obtain an approval or waiver from, or to avoid an action or proceeding by, any Governmental Authorities, (ii) the delivery of required notices to, and the obtaining of required consents or waivers from, third parties and (iii) the execution and delivery of any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement. Buyer shall use its best efforts to take, or cause to be taken, all actions and to do, or cause to be done a submission of a DEA Form 224 Application for Registration no later than the close of the business day after the Closing.

Section 4.3. Press Releases. Buyer and Seller shall consult with each other before issuing any press release or making any other public statement with respect to this Agreement or the transactions contemplated hereby and shall not issue any such press release or make any such other public statement without the consent of the other party, which shall not be unreasonably withheld, except as such release or statement may be required by applicable Law or any listing agreement with or rule of any national securities exchange, in which case the party required to make the release or statement shall consult with the other party about, and allow the other party reasonable time (to the extent permitted by the circumstances) to comment on, such release or statement in advance of such issuance, and the party will consider such comments in good faith.

Section 4.4. Accounts Receivable; Reconciliation. The Company's Accounts Receivable as of the end of the business day on the Closing Date (the "Pre-Closing AR") will be paid weekly within three (3) business days of receipt by the Company for at least one year from the Closing Date. As promptly as practicable following the end of each week after the Closing Date for up to one year after the Closing Date, Buyer shall prepare and deliver to Seller a preliminary report of the Company's Accounts Receivable outstanding prior to the Closing Date received during such week (the "Preliminary AR Report"). Promptly following receipt of the Preliminary AR Report, Seller may review the same and, within five (5) business days after the date of such receipt, may deliver to Buyer a notice setting forth any objections to the Preliminary AR Report, together with a summary of the reasons therefore and calculations which, in its view, are necessary to eliminate such objections (an "AR Objection Notice"). If Seller does not so object within such five (5) business day period, the Preliminary AR Report shall be final and binding. Buyer and Seller shall use their reasonable efforts to resolve by written agreement (the "Agreed AR Adjustments") any differences as to the Preliminary AR Report and, if Seller and Buyer so resolve any such differences, the Preliminary AR Report, as adjusted by the Agreed AR Adjustments, shall be final and binding for purposes of this Agreement. The parties hereto shall make available to Buyer, Seller, and their respective representative such books, records and other information (including work papers) as any of the foregoing may reasonably request to prepare or review the Preliminary AR Report.

Section 4.5. Mortgage Release; Documentary Stamp Taxes. The satisfaction of mortgage will be filed within forty-five (45) days of payment of the Pay-off Portion. Buyer hereby agrees to pay at Closing any fees imposed by the State of Florida including documentary stamp tax or intangible tax arising from the Note.

## ARTICLE V. CLOSING AND CLOSING CONDITIONS

Section 5.1. Closing. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at 1:00 p.m., local time, on August 14, 2010 at the offices of the Company, or at another time or place, or on another date not later than August 15, 2020, as the parties may mutually agree. The date on and time at which the Closing occurs is referred to in this Agreement as the "Closing Date."

Section 5.2. Conditions Precedent to Obligations of Buyer. The obligations of the Buyer under this Agreement to proceed with the Closing shall be subject to the satisfaction by the Seller and the Company on or prior to the Closing Date of each of the following conditions precedent:

(a) Accuracy of Representations and Warranties. The representations and warranties of the Seller and the Company set forth in this Agreement shall be true and correct on and as of the Closing Date with the same force and effect as

DocuSign Envelope ID: 86420FC2-52AE-43F6-0F0F-463C00216489

EXHIBIT "A"

though made on and as of that date (other than representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct on and as of such date).

(b) *Performance and Compliance.* Seller and the Company shall have performed or complied in all material respects with each covenant and agreement to be performed or complied with by them under this Agreement on or prior to the Closing Date.

(c) *Consents and Approvals.* Seller and the Company shall have obtained or made each consent, authorization, approval, exemption, filing, registration or qualification, required to be obtained or made by any of them in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.

(d) *Litigation.* There shall be no pending or threatened action by or before any Governmental Entity or arbitrator (i) seeking to restrain, prohibit or invalidate any of the transactions contemplated by this Agreement or (ii) seeking monetary relief against any Buyer by reason of the consummation of these transactions, and there shall not be in effect any order, writ, judgment, injunction or decree issued by any Governmental Entity by which Buyer or any of its properties or assets is bound that has that effect.

(e) *Material Adverse Change.* No event shall have occurred and no condition shall exist that constitutes or, with the giving of notice or the passage of time or both, is likely to constitute a Material Adverse Change.

(f) *Assignment of Interests.* Assignment of the Purchased Membership Interests set forth in Section 1.2 hereof.

(g) *Resignation.* An executed Resignation of Seller from each position she holds with the Company.

(h) *Pay-off Letter.* A pay-off letter from the holder of the mortgage note owed by the Company for the Property setting forth the payoff amount owed by the Company.

(i) *Independent Contractor Agreement.* An independent contractor agreement between the Company and the Seller in substantially the form attached as Exhibit B.

Section 5.3. **Conditions Precedent to Obligations of Seller.** The obligations of Seller under this Agreement to proceed with the Closing shall be subject to the satisfaction by Buyer on or prior to the Closing Date of each of the following conditions precedent:

(a) *Accuracy of Representations and Warranties.* The representations and warranties of Buyer set forth in this Agreement shall be true and correct on and as of the Closing Date with the same force and effect as though made on and as of that date.

(b) *Performance and Compliance.* Buyer shall have performed or complied in all material respects with each covenant and agreement to be performed or complied with by it under this Agreement on or prior to the Closing Date.

(c) *Consents and Approvals.* Buyer shall have obtained or granted each consent, authorization, approval, exemption, filing, registration or qualification required to be obtained or granted by it in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.

(d) *Litigation.* There shall be no pending or threatened action by or before any Governmental Entity or arbitrator seeking to restrain, prohibit or invalidate any of the transactions contemplated by this Agreement, and there shall not be in effect any Governmental Order that has that effect.

(e) *Independent Contractor Agreement.* An independent contractor agreement between the Company and the Seller in substantially the form attached as Exhibit B.

(f) *Deposits.* Payment by means of check or wire transfer to Seller of any deposits, prorated expenses and prepaid expenses for utility services, leases, insurance, etc., to the extent they remain with the Company.

(g) *Security Agreement.* A security agreement between the Buyer and the Seller in substantially the form attached as Exhibit C.

DocuSign Envelope ID: 88420FC2-52AE-43F6-9F0F-453C00216489

EXHIBIT "A"

(h) *Pledge.* A pledge between the Buyer and the Seller in substantially the form attached as Exhibit D. The Note, pledge and security agreement are collectively the "Loan Documents."

## ARTICLE VI. INDEMNIFICATION

**Section 6.1. Indemnification by Seller.** Seller shall defend, indemnify and hold harmless Buyer and the Company and their respective directors, managers, officers, employees and agents (each a "**Seller Indemnitee**") from and against any and all claims (including without limitation any investigation, action or other proceeding, damages, losses, liabilities, costs and expenses (including without limitation reasonable attorneys' fees and court costs) that constitute, or arise out of or in connection with:

(a) any misrepresentation or breach of warranty under Article II, (a "**Seller Warranty Breach**"); or

(b) any default by Seller or the Company in the performance or observance of any of their covenants or agreements under this Agreement.

**Section 6.2. Indemnification by Buyer.** Buyer shall defend, indemnify and hold harmless Seller and its partners, directors, managers, officers, employees and agents (each a "**Buyer Indemnitee**") from and against any and all claims (including without limitation any investigation, action or other proceeding), damages, losses, liabilities, costs and expenses (including without limitation reasonable attorneys' fees and court costs) that constitute, or arise out of or in connection with:

(a) any misrepresentation or breach of warranty under Article III, (a "**Buyer Warranty Breach**"); or

(b) any default by Buyer in the performance or observance of any of its covenants or agreements under this Agreement.

**Section 6.3. Representation, Settlement and Cooperation.** If any investigation, action or other proceeding (each a "**Proceeding**") is initiated against any Seller Indemnitee or Buyer Indemnitee (each, an "**Indemnitee**") and the Indemnitee intends to seek indemnification from the Seller or the Buyer (each an "**Indemnitor**"), as applicable, under this Article VI, on account of the Indemnitee's involvement in the Proceeding, then the Indemnitee shall give prompt notice to the applicable Indemnitor; provided, however, that the failure to so notify the Indemnitor shall not relieve the Indemnitor of its obligations under this Article VI, but instead shall reduce those obligations by the amount of damages or increased costs and expenses attributable to the failure to give notice. Upon receipt of notice of a Proceeding for which indemnification is available under this Article VI, the Indemnitor shall diligently defend against the Proceeding on behalf of the Indemnitee at the Indemnitor's own expense using counsel reasonably acceptable to the Indemnitee; provided, however, that if the Indemnitor shall fail or refuse to conduct the defense, or if the Indemnitee has been advised by counsel that it may have defenses available to it which are different from or in addition to those available to the Indemnitor or that its interests in the Proceeding are adverse to the Indemnitor's interests, then the Indemnitee may defend against the Proceeding at the Indemnitor's expense. The Indemnitor or Indemnitee, as applicable, may participate in any Proceeding being defended against by the other at its own expense and shall not settle any Proceeding without the prior consent of the other, which consent shall not be unreasonably withheld. The Indemnitor and Indemnitee shall cooperate with each other in the conduct of any Proceeding.

**Section 6.4. Notice and Satisfaction of Indemnification Claims.** No indemnification claim shall be deemed to have been asserted until the applicable Indemnitor has been given notice by the Indemnitee of the amount of the claim and the facts on which the claim is based (including evidence supporting the amount of the claim). For purposes of this Article VI, notice of an indemnification claim shall be deemed to cover claims arising out of or in connection with all related Proceedings so long as, in the case of Proceedings instituted by third parties, the Indemnitee complies with Section 6.3,. Indemnification claims shall be paid within 30 days after the Indemnitor's receipt of the notice described in this Section 6.4. (including the required evidence of the amount of the claim). Evidence of (a) the amount of the claims for which the Indemnitee seeks indemnification, and (b) the Indemnitor's liability shall be in form and content reasonably satisfactory to the Indemnitor.

DocuSign Envelope ID: 88420FC2-52AE-43F6-9F0F-453C00216489

EXHIBIT "A"

Section 6.5. Duration of Indemnification Obligations. Claims for indemnification under this Article VI, only may be asserted at any time on or prior to the first anniversary of the Closing Date.

Section 6.6. Indemnification Threshold and Limits. Notwithstanding any other provision of this Agreement, no Indemnitor shall have any indemnification obligations under Section 6.1.(a), Section 6.1.(c) or Section 6.2.(a) unless and until the claims asserted against the applicable Indemnitor exceed $50,000 in the aggregate (the "Threshold Amount"). If indemnification claims exceed the Threshold Amount, the Indemnitor shall be liable for all indemnification claims properly asserted against it, including those comprising the Threshold Amount, up to no more than One Hundred Thousand Dollars ($100,000.00).

Section 6.7. Exclusive Remedy. Except: (a) for any equitable remedies which the parties may pursue; and (b) for enforcement actions of any kind or nature regarding the terms and provisions of this Article VI, the indemnification under this Article VI, shall be the parties' sole and exclusive remedy, each against another, with respect to matters arising under this Agreement. The parties waive and release any other rights, remedies, causes of action or claims of any kind or nature arising under this Agreement.

## ARTICLE VII. MISCELLANEOUS

Section 7.1. Entire Agreement; Assignment; Amendments. This Agreement (including the Disclosure Schedule and the exhibits and schedules to this Agreement) and the Confidentiality Agreement constitute the entire agreement and supersede all oral agreements and understandings and all written agreements prior to the date hereof between or on behalf of the parties with respect to the subject matter hereof. This Agreement shall not be assigned by any party by operation of law or otherwise without the prior written consent of the other parties hereto. This Agreement may be amended only by a writing signed by each of the parties, and any amendment shall be effective only to the extent specifically set forth in that writing.

Section 7.2. Severability; Expenses; Further Assurances. If any term, condition or other provision of this Agreement is determined by a court of competent jurisdiction to be invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the fullest extent possible. Except as otherwise specifically provided in this Agreement, each party shall be responsible for the expenses it may incur in connection with the negotiation, preparation, execution, delivery, performance and enforcement of this Agreement. The parties shall from time to time do and perform any additional acts and execute and deliver any additional documents and instruments that may be required by applicable Governmental Rules or reasonably requested by any party to establish, maintain or protect its rights and remedies under, or to effect the intents and purposes of, this Agreement.

Section 7.3. Enforcement of the Agreement; Jurisdiction; No Jury Trial.

(a) The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement exclusively in the state courts located in Hillsborough County, Florida, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such action or proceeding, in the United States District Court for the Middle District of Florida, Tampa Division, this being in addition to any other remedy to which they are entitled at law or in equity. In addition, each of the parties to this Agreement irrevocably agrees that any legal action or proceeding with respect to this Agreement and the rights and obligations arising under this Agreement, or for recognition and enforcement of any judgment in respect of this Agreement and the rights and obligations arising under this Agreement brought by

DocuSign Envelope ID: 86420FC2-52AE-43F6-9F0F-453C00216489

EXHIBIT "A"

the other party to this Agreement or its successors or assigns shall be brought and determined exclusively in the state courts located in Hillsborough County, Florida, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such action or proceeding, in the United States District Court for the Middle District of Florida, Tampa Division. Each of the parties to this Agreement hereby irrevocably submits with regard to any such action or proceeding for itself and in respect of its property, generally and unconditionally, to the personal jurisdiction of the aforesaid courts and agrees that it will not bring any action relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the aforesaid courts. Each of the parties to this Agreement hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any action or proceeding with respect to this Agreement, (a) any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason other than the failure to serve in accordance with this Section 7.3.; (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise); and (c) to the fullest extent permitted by the Law, any claim that (i) the suit, action or proceeding in such court is brought in an inconvenient forum; (ii) the venue of such suit, action or proceeding is improper; or (iii) this Agreement, or the subject matter of this Agreement, may not be enforced in or by such courts. Each of Seller and Buyer hereby agrees that service of any process, summons, notice or document by U.S. registered mail to the respective addresses set forth in Section 7.4, shall be effective service of process for any proceeding arising out of, relating to or in connection with this Agreement or the transactions contemplated hereby.

(b) EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION OR OTHER PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER, RELATING TO OR IN CONNECTION WITH THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY HERETO CERTIFIES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY ACTION, SUIT OR PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) EACH PARTY MAKES THIS WAIVER VOLUNTARILY AND (IV) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.3.(b).

Section 7.4. Notices.

All notices and other communications pursuant to this Agreement must be in writing, sent by overnight delivery to the physical addresses set forth below and, where provided, by email or fax to the email addresses or fax number provided below, and will be deemed to have been duly delivered and received on the date reflected on the overnight courier's delivery confirmation:

If to Buyer, to:

LUX PHARMA HOLDINGS, LLC

1712 Pioneer Avenue

Cheyenne, WY 82001

Phil Neuman (PNeuman@Carlislemc.com)

Edward Griffith (eg@thegriffithfirm.com)

DocuSign Envelope ID: 86420FC2-52AE-43F6-9F0F-453C00216469

EXHIBIT "A"

If to Seller, to:

YVONNE OKEKE

9780 N 56TH ST

SUITE D

TEMPLE TERRACE, FL 33617

with a copy (which will not constitute notice to Seller) to:

Shaka A. Scott

Shaka A. Scott, P.A.

1228 East 7th Avenue

Suite 200

Tampa FL 33605

Facsimile: (813) 333-0458

From time to time, any party may provide notice to the other parties of a change in its address, email address or fax number through a notice given in accordance with this Section 7.4. The inability to deliver because of changed address of which no notice is given will be deemed to be receipt of the notice as of the date of such inability to deliver.

Section 7.5. **Governing Law.** This Agreement, and any dispute arising out of, relating to, or in connection with this Agreement, shall be governed by and construed in accordance with the Laws of the State of Florida, without giving effect to any choice or conflict of Law provision or rule (whether of the State of Florida or of any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Florida.

Section 7.6. **Descriptive Headings.** The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

Section 7.7. **Parties in Interest.** This Agreement shall be binding upon and inure solely to the benefit of each party hereto, and nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 7.8. **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement. At the Closing, signature pages of counterparts may be exchanged by facsimile or by electronic transmittal of scanned images thereof, in each case subject to appropriate customary confirmations in respect thereof by the signatory for the party providing a facsimile or scanned image and that party's Closing counsel.

Section 7.9. **Termination.**

(a) This Agreement may be terminated at any time prior to the Closing:

(1) by mutual agreement of Buyer and Seller;

(2) by Buyer (A) if there has been a material misrepresentation by Seller or the Company under this Agreement or a material breach by the Seller or the Company of any of their warranties or covenants set forth in this Agreement or (B) if any of the conditions specified in Section 5.2. shall not have been fulfilled within the time required and shall not have been waived by Buyer;

DocuSign Envelope ID: 86420FC2-52AE-43F8-9F0F-453C00216480

EXHIBIT "A"

(3) by Seller (A) if there has been a misrepresentation by Buyer under this Agreement or a material breach by Buyer of any of its warranties or covenants set forth in this Agreement or (B) if any of the conditions specified in <u>Section 5.3.</u> shall not have been fulfilled within the time required and shall not have been waived by Seller; or

(4) by Buyer or Seller if the Closing shall not have occurred prior to August 15, 2020; provided, however, that Buyer or Seller may terminate this Agreement under this subsection only if the Closing shall not have occurred on or prior to August 15, 2020, for a reason other than a failure by the party or parties asserting the right to terminate to satisfy the conditions to Closing of the other party or parties set forth in <u>Section 5.2.</u> or <u>5.3.</u>.

(b) If this Agreement is terminated by either any party as provided in <u>Section 7.9.(a)</u> then no party shall have any further obligations or liabilities under this Agreement except for obligations or liabilities arising from a breach of this Agreement prior to the termination or that survive the termination by their own terms.

**Section 7.10. Certain Definitions.** For purposes of this Agreement, the following terms shall have the following meanings:

**"Accounts Receivable"** means the balance of money due to the Company for goods or services delivered or used but not yet paid for by customers, including purchases made on credit.

**"Appraised Value"** means the average appraisals of the Property by three (3) professional real estate appraisers. The Seller and Buyer will each pay for an evaluation of the Property's value by a professional appraiser that it selects and equally split the cost of a third appraiser selected by the two party-selected appraisers. All of appraisals will be completed within 30 days after the Closing Date.

**"Business Day"** means any day on which national banks are open for business in the city of New York City, New York.

**"Material Adverse Effect"** means any state of facts, change, development, event, effect, condition, occurrence, action or omission that, individually or in the aggregate, is reasonably expected to result in a material adverse effect on the business, prospects, assets, properties, financial condition, results of operations or prospects of the Company, taken as a whole, or prevent, materially impede or materially delay the consummation by the Company of the transactions contemplated by this Agreement.

**"Permitted Lien"** means (i) Liens for Taxes not yet due and payable or that are being contested in good faith and by appropriate proceedings and for which adequate reserves in accordance with GAAP have been established; (ii) mechanics', carriers', workmen's, repairmen's, materialmen's and other Liens arising by operation of Law; (iii) Liens or security interests that arise or are incurred in the ordinary course of business relating to obligations not yet due on the part of the Company or secure a liquidated amount that are being contested in good faith and by appropriate proceedings and for which adequate reserves in accordance with GAAP have been; (iv) pledges or deposits to secure obligations under workers' compensation Laws or similar Laws or to secure public or statutory obligations; (v) pledges and deposits to secure the performance of bids, trade contracts, leases, surety and appeal bonds, performance bonds and other obligations of a similar nature, in each case in the ordinary course of business; (vi) easements, encroachments, declarations, covenants, conditions, reservations, limitations and rights of way (unrecorded and of record) and other similar restrictions or encumbrances of record, zoning, building and other similar ordinances, regulations, variances and restrictions, and all defects or irregularities in title, including any condition or other matter, if any, that may be shown or disclosed by a current and accurate survey or physical inspection; (vii) pledges or deposits to secure the obligations under the Company's revolving credit facility and other existing indebtedness of the Company; (viii) all Liens created or incurred by any owner, landlord, sublandlord or other Person in title; and (ix) any other Liens which do not materially interfere with the Company's use and enjoyment of real property or materially detract from or diminish the value thereof.

**"Person"** shall mean any individual, corporation, limited liability company, partnership, association, trust, estate or other entity or organization.

**"Property"** means the real estate located at 637 1st Street S., Winter Haven, Florida 33880.

DocuSign Envelope ID: 86420FC2-52AE-43F6-9F0F-453C00216489

EXHIBIT "A"

Section 7.11. **Interpretation.** The words "hereof," "herein," "hereby," "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified. Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation." The words describing the singular number shall include the plural and vice versa, words denoting either gender shall include both genders and words denoting natural Persons shall include all Persons and vice versa. The phrases "the date of this Agreement," "the date hereof," "of even date herewith" and terms of similar import, shall be deemed to refer to the date set forth in the preamble to this Agreement. Any reference in this Agreement to a date or time shall be deemed to be such date or time in New York City, New York, unless otherwise specified. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any Person by virtue of the authorship of any provision of this Agreement.

[SIGNATURE PAGE FOLLOWS]

DocuSign Envelope ID: 88420FC2-52AE-43F6-9F0F-463C00216489

EXHIBIT "A"

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all at or on the date and year first above written.

BUYER:

LUX PHARMA HOLDINGS, LLC

By _____

Phil Neuman, Member


SELLER:

_____
YVONNE OKEKE

COMPANY:

YVONNE ENTERPRISES LLC

By _____

Name: YVONNE OKEKE

Title: Manager

DocuSign Envelope ID: 86420FC2-52AE-43F6-9F0F-453C00216489

EXHIBIT "A"

SCHEDULE 1.2(B)

DocuSign Envelope ID: 88420FC2-52AE-43F6-9F0F-463C00216489

EXHIBIT "A"

EXHIBIT A

NOTE

DocuSign Envelope ID: 80420FC2-52AE-43F6-0F0F-453C00218480

EXHIBIT "A"

EXHIBIT B

PROFESSIONAL SERVICES AGREEMENT

EXHIBIT "A"

## FIRST AMENDMENT TO
## MEMBERSHIP INTEREST PURCHASE AGREEMENT

WHEREAS YVONNE OKEKE (the "Seller"), YVONNE ENTERPRISES LLC, a Florida limited liability company d/b/a KAY PHARMACY (the "Company"), and LUX PHARMA HOLDINGS, LLC, a Wyoming limited liability company (the "Buyer" and collectively, with the Seller and the Company, the "Parties") entered into a Membership Interest Purchase Agreement (the "Purchase Agreement") on or about August 14, 2020;

WHEREAS the Parties desire to clarify their rights and obligations regarding the Company's bank accounts and other accounts with third parties with which the Company does business;

IT IS HEREBY AGREED as follows:

1.  Bank Accounts.

    a.  On Tuesday, September 8, 2020, the Seller and the Buyer will take all necessary steps (i) to open a new Company bank account at Wells Fargo Bank, N.A. (the "WF Bank Account"); and (ii) to add the Buyer's representation, Colin Conner, as a party with observer status for the Company's existing bank account at Bank of America (the "BoA Bank Account").

    b.  The Buyer will have exclusive control and signing privileges on the WF Bank Account. To the extent Wells Fargo requires the Seller to be a signer on the account during the transition period that the Seller is managing the Company pursuant its Professional Services Agreement with the Seller, the Seller agrees not to use signing authority to initiate or stop any transactions in the account.

    c.  The Seller will retain exclusive control and signing privileges on the BoA Bank Account subject to the provisions of the Purchase Agreement as amended, although in his status as an account observer, Mr. Conner will have full access to all past and future transactions in that account.

    d.  The Seller represents that BoA Bank Account is the Company's only existing bank account. The Seller shall close the BoA Bank Account after (i) the full transition is complete and Seller's Professional Services Agreement is terminated; and (ii) the Company's application for loan forgiveness of its SBA PPP loan has been processed.

EXHIBIT "A"

2.  <u>Company accounts with third parties</u>.

    a.  On or before Tuesday, September 8, 2020, the Seller will provide the Buyer with the login user IDs, passwords and any other information necessary to access the Company's accounts with third parties, including banks, vendors, service providers, wholesalers, pharmacies, insurers, Provider Pay, McKesson or any other third party with whom the Company has an account. The Seller will also provide the names and contact information for the third-party representatives responsible for communicating with the Company regarding these accounts.

    b.  Until the full transition is complete, the Buyer shall use this information to contact any third party except through a 340B program consultant to coordinate the Company's participation in 340B program. The Buyer agrees to bear the full consequences of any negative action that arises from this contact and will hold Seller harmless for any resulting disruption of business.

3.  <u>Provider Pay/Zion sub bank account</u>.

    a.  The Seller relinquishes all rights to the Provider Pay Account and Zion sub bank account for payments of prescriptions issued on or after August 19, 2020.

    b.  On Tuesday, September 8, 2020, the Buyer and Seller shall take all necessary steps to authorize and direct Provider Pay to make all future payments through the Company's existing Zion sub bank account to the WF Bank Account. The Buyer shall continue to have access to the Provider Pay account until the full transition is complete and the Seller's Professional Services Agreement is terminated.

    c.  As soon as the WF Bank Account is opened, the Seller shall make an initial wire transfer from the BoA Bank Account to the WF Bank Account equal to the sum of all payments received from Provider Pay, if any, for prescriptions issued on or after August 19, 2020.

    d.  After Provider Pay starts making payments to the WF Bank Account, the Seller shall make a final wire transfer, if necessary, from the BoA Bank Account to the WF Bank Account equal to all payments, if any, for prescriptions issued on or after August 19, 2020 that were received from Provider Pay after the initial wire transfer set forth in paragraph 4.

2

EXHIBIT "A"

4.   <u>Credit card accounts.</u>

    a.    On Tuesday, September 8, 2020, or as soon as the WF Bank Account is opened, the Seller shall take all necessary steps to direct existing credit card merchant accounts to make payments to the WF Bank Account.

    b.    The Seller will close the Company's existing credit card account with Bank of America.

5.   <u>Company car.</u>

    a.    The Parties agree that the Seller may keep the Company car, provided that the Seller pay-off the existing loan used to purchase the car and transfer title of the car from the Company to the Seller. Seller is responsible for all related costs or fees.

    b.    The Seller represents that there are no other Company assets to which she wants to retain possession or control.

6.   <u>Accounts Receivable/Accounts Payable.</u>

    a.    The Parties acknowledge that the Seller is responsible for the Company's accounts payable incurred before August 19, 2020 and the Buyer is responsible for the Company's accounts payable incurred on or after August 19, 2020.

    b.    The Parties acknowledge that the Seller is entitled to the Company's accounts receivable for products sold, prescriptions issued, and services rendered before August 19, 2020 and the Buyer is entitled to the Company's accounts receivable for products sold, prescriptions issued, and services rendered after August 19, 2020.

    c.    The Seller remains liable for the reconciliation and payment of the Company's pre-August 19, 2020 accounts receivable pursuant to Section 4.4 of the Purchase Agreement, although such reconciliation will include the Seller's retention of any remaining funds in the BoA Bank Account after that account is closed. For the avoidance of doubt, to the extent such remaining funds include income from post-August 19, 2020 accounts receivable, that income will be credited toward the Seller's payment of pre-August 19, 2020 accounts receivable.

3

EXHIBIT "A"

7.    Anticipated Volume of Prescriptions and Construction.

    a.    The Parties acknowledge that the Company anticipates receiving 1000 or more prescriptions per month from the Buyer's affiliated clinics via the escribe process. The prescriptions will be exclusively for non-controlled substances such as blood pressure medication, Hepatitis C medications, and HIV-prevention ("PREP," including the medications Truvada and Descovy). Seller has no objection, and agrees, to filling these prescriptions expeditiously during the term of her Professional Services Agreement in accordance with the rules governing the Pharmacy profession and the duties of a professional pharmacies as summarized in the next sub-section.

    b.    The Parties acknowledge the pharmacist has a professional duty to assure that for each prescription submitted, there is a patient-physician relationship and verifiable evidence that the patient received the prescribed medication. meds. The pharmacist will fill and dispense any medication as long as the prescription is a legitimate prescription and issued by a doctor in the normal and usual course of his or her work.

    c.    Within 90 days, the Company expects to begin construction on a second-floor addition to the premises, after all local and state permits are issued. Structural engineers, architects and other inspectors will inspect the premises in preparation for the construction. Seller has no objection, and agrees, to this construction project.

8.    September 8, 2020 Meeting.

    a.    The Seller, represented by Yvonne Okeke, and the Buyer, represented by Colin Conner, shall meet on Tuesday, September 8, 2020, at 10:00 a.m. for the purpose of implementing the provisions of this agreement. They will meet at the Wells Fargo branch located at 1001 Havendale Blvd NW in Winter Haven, Florida for the purpose of implementing the provisions of § 1, *supra*.

    b.    Seller represents that she is able to add Mr. Conner as an observer to the BoA Account without meeting in person at Bank of America and shall provide Mr. Conner with the credentials to access account information at or before the September 8, 2020 meeting.

    c.    The Parties shall use their best good faith efforts to implement the provisions of §§ 2 through 5, *supra*, at the September 8, 2020 meeting or as soon thereafter as possible.

4

EXHIBIT "A"

d.   Buyer has until 15th of October to finalize on valuation of the property and fulfill all other requirements on paying off the balance on the building.

e.   Buyer is to produce evidence of DEA application and to share or forward all correspondence from DEA and the Buyer.

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all at or on September 8, 2020.

BUYER:

LUX PHARMA HOLDINGS, LLC

By _____

Phil Neuman, Member

SELLER:

YVONNE OKEKE

COMPANY:

YVONNE ENTERPRISES LLC

By _____

Name: YVONNE OKEKE

Title: Manager

5

EXHIBIT "A"

# SECOND AMENDMENT TO
## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Second Amendment (the "Second Amendment") to that Membership Interest Purchase Agreement entered into among YVONNE OKEKE (the "Seller"), YVONNE ENTERPRISES LLC, a Florida limited liability company d/b/a KAY PHARMACY (the "Company"), and LUX PHARMA HOLDINGS, LLC, a Wyoming limited liability company (the "Buyer" and collectively, with the Seller and the Company, the "Parties") on or about August 14, 2020, as amended by the First Amendment to Membership Interest Purchase Agreement on or about September (the "Purchase Agreement") is made and entered into effective as of October 6, 2020 (the "Second Amendment Effective Date").

WHEREAS the Parties desire to amend the Purchase Agreement to reflect the change of ownership process obligations;

IT IS HEREBY AGREED as follows:

1.  Section 1.2 of the Purchase Agreement **Purchase Price** is deleted in its entirety and replaced with the following text:

(a) Total Purchase Price. The purchase price for the Membership Interests (the "Purchase Price") shall be equal to (i) $250,000.00 (the "Cash Portion"), (ii) $124,474.13 the pay-off value of the mortgage note owed by the Company for the Property pursuant to the Pay-Off Letter provided by the holder of the mortgage note (the "Pay-off Portion") (collectively with the Cash Portion the "Closing Purchase Price"), and (iii) plus a secured note amended to reflect the principal amount of $165,525.87 secured by the assets of the Buyer, including a pledge of the Membership Interests (the "Note").
(b) Closing Purchase Price Payment. The Closing Purchase Price will be paid on the Closing Date by means of wire transfer in immediately available funds in accordance with the funds flow memorandum set forth on Schedule 1.2(b).
(c) Note. Buyer will deliver the Note.

2.  The last sentence of Section 4.2 of the Purchase Agreement **Best Efforts; Government Filings** is deleted, and the following text will replace the deleted text:

The Seller shall execute a Bill of Sale and Powers of Attorney dated on or before October 6, 2020 and send those executed documents to the Buyer by email by 5:00 p.m. on the date they are executed. Upon receipt of those executed documents, the Buyer shall notify the DEA and the Florida Board of Pharmacy that the Company has been sold as of the date of the executed documents, which shall be the date they are received by the Buyer (the "Regulatory Notice Date"). The Buyer shall thereafter take all necessary actions to obtain approval of the transaction by the DEA and the Florida Board of Pharmacy. In the event of a waiver Buyer shall deliver to Seller the DEA special agent's letter acknowledging the consummation of the transactions contemplated hereunder.

EXHIBIT "A"

3. The following sentence is added to the end of Section 4.4 Accounts Receivable/Reconciliation:

The Parties shall conduct in a full audit of the Company's income and expenses commencing immediately when the Provider Pay system is available to reconcile the payments and claims for the period starting on August 14, 2020. Payments owed by a Party will be made upon the completion of such reconciliation. Subsequently, the Parties will conduct additional weekly reconciliations to be completed before December 5, 2020 for the purpose reconciling amounts owed or due to either Party.

4. Add Section 4.6 Inventory. to the Purchase Agreement:

On the Regulatory Notice Date, the Buyer and Seller shall prepare a list of all controlled substances in the possession of the Company pursuant to 21 C.F.R. § 1301.52(e)(1).

5. Add Section 4.7 Powers of Attorney. to the Purchase Agreement:

Powers of Attorney. Each power of attorney shall have an initial term of 90 days and may extended by another 30 days. The Seller shall not revoke the any powers of attorney prior to its expiration unless the Seller becomes aware that any such powers of attorney is being utilized in a manner that materially conflicts with the applicable rules and regulations, and such conflicting use does not cease within five (5) days of the Seller giving written notice thereof to the Buyer, citing with reasonable specificity the nature of such inconsistent use. From and after the Closing, the Buyer shall reimburse, indemnify and hold harmless the Seller and the Seller's heirs, personal representatives, successors and assigns for any claims, fines, penalties or damages relating to the use, misuse or alleged misuse of the powers of attorney by the Company and/or the Buyer after the Closing.

6. The defined term "Appraised Value" under Section 7.10 of the Purchase Agreement is deleted.

7. Conflicts, Use of Terms. In the event of conflict between the terms and conditions of the Purchase Agreement and the terms and conditions of this Second Amendment, the terms and conditions relating to the subject matter of this Second Amendment will control.

8. Full Force and Effect of Agreement. Except as expressly modified by this Second Amendment, the Purchase Agreement shall remain in full force and effect as presently written and the rights, duties, liabilities and obligations of the Parties thereto, as presently constituted, will continue in full effect. The Parties agree that all of the terms of the Purchase Agreement not otherwise modified by this Second Amendment are effective on and by the Second Amendment Effective Date with the same effect as though such terms had been made on and by such date, and each

EXHIBIT "A"

the same effect as though such terms had been made on and by such date, and each Party hereby certifies to such effect to each other with the execution of this Second Amendment.

9. Counterparts. This Second Amendment may be executed in one or more counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument. This Second Amendment may be executed electronically (including PDF) or by facsimile. The Parties agree that facsimile and electronic copies of signatures have the same effect as original signatures.

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all at or on the date and year first above written.

BUYER:

LUX PHARMA HOLDINGS, LLC

By

Phil Neuman, Member

SELLER:

YVONNE OKEKE

COMPANY:

YVONNE ENTERPRISES LLC

By

Name: YVONNE OKEKE

Title: Manager

3

DocuSign Envelope ID: 86420FC2-52AE-43F6-9F0F-453C00216489

**SECURED PROMISSORY NOTE**　　　　　　　**EXHIBIT "B"**

**DOCUMENTARY STAMP TAXES IN THE AMOUNT OF $614.25 ARE BEING PAID IN CONNECTION WITH THIS NOTE AS REQUIRED BY FLORIDA LAW.**

WINTER HAVEN, Florida

$175,525.87 (AS ADJUSTED PURSUANT TO THE TERMS HEREIN)

August 14, 2020

RECITALS.

Promise to Pay. For value received, LUX PHARMA HOLDINGS, LLC, a Wyoming limited liability company ("*Maker*"), hereby promises to pay to the order of YVONNE OKEKE, an individual residing in Tampa, Florida (collectively with any and all of its successors and assigns and/or any other holder of this Note, "*Holder*"), without offset, in immediately available funds in lawful money of the United States of America, without counterclaim or setoff and free and clear of, and without any deduction or withholding for, any taxes or other payments), at 10526 LUCAYA DRIVE, TAMPA, FL 33647, the principal sum of ONE HUNDRED AND SEVENTY-FIVE THOUSAND FIVE HUNDRED TWENTY-FIVE AND 87/100 DOLLARS ($175,525.87) (or the adjusted principal amount calculated on the following terms: the difference of (Y) the amount of the Appraised Value of the Property (Z) minus ONE HUNDRED AND TWENTY-FOUR THOUSAND FOUR HUNDRED SEVENTY-FOUR AND 13/100 DOLLARS ($124,474.13), provided that the Appraised Value of the Property will not exceed $300,000.00 for the purposes of this Note (this "*Note*"), if that amount is less (the aggregate unpaid principal balance of this Note is referred to herein, from time to time, as the "*Principal Debt*")) (the "*Indebtedness*"). The loan evidenced by this Note is referred to herein as the "*Loan*". Unless otherwise defined herein, capitalized terms used in this Note shall have the meanings given such terms in the Membership Interest Purchase Agreement among YVONNE OKEKE ("Seller"), YVONNE ENTERPRISES LLC, a Florida limited liability company D/B/A KAY PHARMACY ("Company") and LUX PHARMA HOLDINGS, LLC, a Wyoming limited liability company ("Buyer") dated as of the date hereof (the "Purchase Agreement").

Section 1. <u>Payments, Time and Place of Payments and Maturity Date</u>. The Principal Debt of this Note shall be due and payable in full 30 days after the Appraisal Value of the Property is determined pursuant to the Purchase Agreement (the "*Maturity Date*"), provided that Maker must designate its appraiser on or before August 21, 2020. Maker hereby agrees to pay any additional fees imposed by the State of Florida including additional documentary stamp tax or intangible tax when advances are made under the Loan, this Note or upon any renewals thereof.

Section 2. <u>Interest</u>.

Section 2.1 <u>Interest Rates</u>. The Principal Debt from day to day outstanding that is not past due shall not bear any interest.

Section 2.2 <u>Computations and Determinations</u>. All interest shall be computed on the basis of a year of 360 days and paid for the actual number of days elapsed (including the first day but excluding the last day) over a term of 30 years for an amortization period of 30 years. Holder shall determine each interest rate applicable to the Principal Debt in accordance with this Note and its determination thereof shall be conclusive in the absence of manifest error. The books and records of Holder shall be conclusive evidence, in the absence of manifest error, of all sums owing to Holder from time to time under this Note, but the failure to record any such information shall not limit or affect the obligations of Maker under the Loan Documents.

Section 2.3 <u>Increased Cost and Reduced Return</u>. If at any time after the date hereof, Holder reasonably determines that the adoption or modification of any applicable Law regarding taxation, Holder's required

Page 1

DocuSign Envelope ID: 86420FC2-52AE-43F6-9F0F-453C00216480

EXHIBIT B

levels of reserves, deposits, insurance or capital (including any allocation of capital requirements or conditions), or similar requirements under applicable Laws, or compliance by Holder with any of such requirements, has or would have the effect of (a) increasing Holder's costs related to the Indebtedness, or (b) reducing the yield or rate of return of Holder on the Indebtedness, to a level below that which Holder could have achieved but for the adoption or modification of any such requirements, Maker shall, within fifteen (15) days of any request by Holder, pay to Holder such additional amounts as (in Holder's sole judgment, after good faith and reasonable computation) will compensate Holder for such increase in costs or reduction in yield or rate of return of Holder. No failure by Holder to immediately demand payment of any additional amounts payable hereunder shall constitute a waiver of Holder's right to demand payment of any such amounts at any subsequent time. Nothing herein contained shall be construed or shall so operate as to require Maker to pay any interest, fees, costs or charges greater than is permitted by applicable Laws.

Section 2.4 Past Due Rate. If any amount payable by Maker under any Loan Document is not paid when due (without regard to any applicable grace periods), such amount shall thereafter bear interest at the Past Due Rate (as hereinafter defined) to the fullest extent permitted by applicable Law. In addition, following any Event of Default, all Indebtedness shall bear interest at the Past Due Rate. In either case, accrued and unpaid interest or past due amounts (including interest on past due interest) shall be due and payable on demand, at a rate per annum (the "*Past Due Rate*") equal to the higher of ten percent (10%).

Section 3. Prepayment.

(a) Maker may prepay the Principal Debt, in full at any time but not in part, provided that:

    (i)    Net Property Value Price has been calculated and determined in accordance with the terms of this Note and the Purchase Agreement.

    (ii)    Holder shall have actually received from Maker prior irrevocable written notice (the "*Prepayment Notice*") setting forth (A) Maker's intent to prepay, (B) the Indebtedness, and (C) the date on which the prepayment will be made;

    (iii)    the Prepaid Principal shall be in the amount of the Indebtedness so that the prepayment retires the outstanding balance of this Note in full;

    (iv)    plus any other sums that have become due to Holder under the Note, Security Documents or Purchase Agreement on or before the date of prepayment but have not been paid; and

(b) If this Note is prepaid in full, any commitment of Holder for further advances shall automatically terminate. No Prepaid Principal may be reborrowed.

Section 4. Late Charges. If Maker shall fail to make any payment under the terms of this Note within five (5) days after the date such payment is due (other than with respect to the payment due at maturity for which there is no grace period), Maker shall pay to Holder on demand a late charge calculated at the Past Due Rate. Such five (5) day period shall not be construed as in any way extending the due date of any payment. The late charge is imposed for the purpose of defraying the expenses of Holder incident to handling such delinquent payment. This charge shall be in addition to, and not in lieu of, any other amount that Holder may be entitled to receive or action that Holder may be authorized to take as a result of such late payment.

Section 5. Secured Note. This Note is secured by the Collateral. As used in this instrument, the term "Collateral" shall refer to all property that is encumbered to secure any obligation of the Note, including without limitation the items described in the schedule attached to this Note, and the property encumbered by the security agreement and pledge (the "Security Documents") that secures this Note, and all other property encumbered by any other security documents from Maker to Holder which secure this Note, together with all property of Maker that for any purpose, whether in trust for Maker or for custody, pledge, collection or otherwise, is now or hereafter in the actual or constructive possession of, or in transit to, Holder in any capacity, its correspondents or agents, and the right of set-off against all deposits and credits of Maker with, and all claims of Maker against, Holder at any time existing. With respect thereto, the parties understand that Holder is authorized at any time without prior notice to

DocuSign Envelope ID: 86420FC2-52AE-43F6-9F0F-453C00216489

apply such Collateral in whole or in part, and in such order as Holder may elect, to the payment of or as a reserve against the amounts outstanding under the Loan, whether other collateral therefor is deemed adequate or not.

Section 6. <u>Certain Provisions Regarding Payments</u>. All payments made under this Note shall be applied, to the extent thereof, to late charges, to accrued but unpaid interest, to unpaid principal, and to any other sums due and unpaid to Holder under the Loan Documents, in such manner and order as Holder may elect in its sole discretion, any instructions from Maker or anyone else to the contrary notwithstanding. Remittances shall be made without offset, demand, counterclaim, deduction, or recoupment (each of which is hereby waived) and shall be accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks. Acceptance by Holder of any payment in an amount less than the amount then due on any Indebtedness shall be deemed an acceptance on account only, notwithstanding any notation on or accompanying such partial payment to the contrary, and shall not in any way (a) waive or excuse the existence of an Event of Default (as hereinafter defined); (b) waive, impair, or extinguish any right or remedy available to Holder hereunder or under the other Loan Documents; or (c) waive the requirement of punctual payment and performance or constitute a novation in any respect. Payments received after 2:00 p.m. shall be deemed to be received on, and shall be posted as of, the following Business Day. Whenever any payment under this Note or any other Loan Document falls due on a day which is not a Business Day, such payment may be made on the next succeeding Business Day.

Section 7. <u>Events of Default</u>. The occurrence of any one or more of the following shall constitute an *"Event of Default"* under this Note:

(a) Maker fails to pay when and as due and payable any amounts payable by Maker to Holder under the terms of this Note and such failure continues five (5) Business Days.

(b) any covenant, agreement or condition in this Note is not fully and timely performed, observed, or kept, subject to any applicable grace or cure periods set forth in this Note;

(c) the Holder learns that any warranty, representation, certificate or statement of Maker (whether contained in this Note or not) pertaining to or in connection with this Note or the Loan or credit evidenced by this Note, is not true or is in dispute;

(d) Maker becomes insolvent or any insolvency proceedings (as said terms "insolvent" and "insolvency proceedings" are defined in the Uniform Commercial Code of Florida) are instituted or made by or against Maker, or application is made for the appointment of a receiver for Maker or for any of the assets of Maker;

(e) the entry of a judgment against Maker;

(f) the issuing of any levy, attachment or garnishment, or the filing of any lien against any property of Maker;

(g) the determination by Holder that a material adverse change has occurred in the financial condition of Maker (a) from the conditions set forth in the most recent financial statement of such Maker heretofore furnished to Holder, or (b) from the financial condition of such Maker as heretofore most recently disclosed to Holder in any manner;

(h) failure of Maker to do all things necessary to preserve and maintain the value and collectability of the Collateral, including but not limited to the payment of taxes and premiums on policies of insurance on the due date without benefit of the grace period;

(i) any transfer (defined below) of any of the Collateral without prior written consent of Holder;

(j) the death of Maker;

(k) the dissolution, merger, consolidation, change of control by transfer of 50% or more of the voting power or reorganization of LUX PHARMA HOLDINGS, LLC;

DocuSign Envelope ID: 86420FC2-52AE-43F8-9F0F-453C00216480

(l) violation by Maker of any legal requirement applicable to the Loan or any of the transactions evidenced by the Loan Documents;

(m) the actual or attempted revocation of a guaranty by any guarantor who has guaranteed the obligations hereunder not yet advanced, or not yet re-advanced under a revolving credit arrangement which may be herein provided; or

(n) An Event of Default (as therein defined) occurs under any of the Loan Documents other than this Note.

Section 8. Remedies. Upon the occurrence of an Event of Default, Holder may at any time thereafter exercise any one or more of the following rights, powers and remedies:

(a) Holder may accelerate the Maturity Date and declare the unpaid principal balance and accrued but unpaid interest on this Note, and all other amounts payable hereunder and under the other Loan Documents, at once due and payable, and upon such declaration the same shall at once be due and payable.

(b) Holder may set off the amount owed by Maker to Holder, whether or not matured and regardless of the adequacy of any other collateral securing this Note, against any and all accounts, credits, money, securities, or other property now or hereafter on deposit with, held by or in the possession of Holder to the credit or for the account of Maker, without notice to or the consent of Maker.

(c) Holder may exercise any of its other rights, powers and remedies under the Loan Documents or at law or in equity.

Section 9. Remedies Cumulative. All of the rights and remedies of Holder under this Note and the other Loan Documents are cumulative of each other and of any and all other rights at law or in equity, and the exercise by Holder of any one or more of such rights and remedies shall not preclude the simultaneous or later exercise by Holder of any or all such other rights and remedies. No single or partial exercise of any right or remedy shall exhaust it or preclude any other or further exercise thereof, and every right and remedy may be exercised at any time and from time to time. No failure by Holder to exercise, nor delay in exercising, any right or remedy shall operate as a waiver of such right or remedy or as a waiver of any Event of Default.

Section 10. Costs and Expenses of Enforcement. Maker agrees to pay to Holder on demand all costs and expenses incurred by Holder in seeking to collect this Note or to enforce any of Holder's rights and remedies under the Loan Documents, including court costs and reasonable attorneys' fees and expenses, whether or not suit is filed hereon, or whether in connection with bankruptcy, insolvency, or appeal.

Section 11. Heirs, Successors and Assigns. The terms of this Note and of the other Loan Documents shall bind and inure to the benefit of the heirs, devisees, representatives, successors and assigns of the parties. The foregoing sentence shall not be construed to permit Maker to, and Maker shall not, assign the Loan, or its rights and obligations under this Note or any of the Loan Documents, except as otherwise expressly permitted under the other Loan Documents.

Section 12. General Provisions. Time is of the essence with respect to Maker's obligations under this Note, subject to applicable notice and/or cure periods. If more than one person or entity executes this Note as Maker, all of said parties shall be jointly and severally liable for payment of the Indebtedness. Maker and each party executing this Note as Maker hereby severally (a) waive demand, presentment for payment, notice of dishonor and of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration, and all other notices (except any notices which are specifically required by this Note or any other Loan Document), filing of suit and diligence in collecting this Note or enforcing any of the security herefor; (b) agree to any substitution, subordination, exchange, or release of any such security or the release of any party primarily or secondarily liable hereon; (c) agree that Holder shall not be required first to institute suit or exhaust its remedies hereon against Maker or others liable or to become liable hereon or to perfect or enforce its rights against them or any security herefor; (d) consent to any extensions or postponements of time of payment on this Note for any period or periods of time and to any partial payments, before or after maturity, and to any other indulgences with respect hereto,

DocuSign Envelope ID: 86420FC2-52AE-43F0-9F0F-453C00216489

without notice thereof to any of them; (e) submit (and waive all rights to object) to non-exclusive personal jurisdiction of any state or federal court sitting in the State of Florida and the state and county in which payment on this Note is to be made for the enforcement of any and all obligations under this Note and the other Loan Documents; (f) waive the benefit of all homestead and similar exemptions as to this Note; (g) agree that their liability under this Note shall not be affected or impaired by any determination that any title, security interest or lien taken by Holder to secure this Note is invalid or unperfected; and (h) subordinate to the Loan and the Loan Documents any and all rights against Maker and any security for the payment on this Note, whether by subrogation, agreement or otherwise, until this Note is paid in full. A determination that any provision of this Note is unenforceable or invalid shall not affect the enforceability or validity of any other provision and the determination that the application of any provision of this Note to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances. This Note may not be amended except in a writing specifically intended for such purpose and executed by the party against whom enforcement of the amendment is sought. Title and headings in this Note are for convenience only and shall be disregarded in construing it. Whenever a time of day is referred to herein, unless otherwise specified such time shall be the local time of the place where payment on this Note is to be made.

Section 13. Notices. Any notice, request, or demand to or upon Maker or Holder shall be deemed to have been properly given or made when delivered in accordance with the terms of the Loan Agreement regarding notices.

Section 14. No Usury. It is expressly stipulated and agreed to be the intent of Maker and Holder at all times to comply with applicable Florida state law or applicable United States federal law (to the extent that it permits Holder to contract for, charge, take, reserve, or receive a greater amount of interest than under state law) and that this Section shall control every other covenant and agreement in this Note and the other Loan Documents. If applicable state or federal law should at any time be judicially interpreted so as to render usurious any amount called for under this Note or under any of the other Loan Documents, or contracted for, charged, taken, reserved, or received with respect to the Loan, or if Holder's exercise of the option to accelerate the Maturity Date, or if any prepayment by Maker results in Maker having paid any interest in excess of that permitted by applicable law, then it is Holder's express intent that all excess amounts theretofore collected by Holder shall be credited on the principal balance of this Note and all other indebtedness secured by the Security Documents and the other Loan Documents, and the provisions of this Note and the other Loan Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. All sums paid or agreed to be paid to Holder for the use or forbearance of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan. During any time that the Loan bears interest at the maximum lawful rate (whether by application of this paragraph, the default provisions of this Note or otherwise), interest shall be computed on the basis of the actual number of days elapsed and the actual number of days in the respective calendar year.

Section 15. Lost Note. Upon receipt of an affidavit of an officer of Holder as to the loss, theft, destruction or mutilation of this Note or any other security document which is not of public record, and, in the case of any such loss, theft, destruction or mutilation, upon cancellation of this Note or other security document, Maker will issue, in lieu thereof, a replacement note or other security document in the same principal amount thereof and otherwise of like tenor.

Section 16. Pledge to the Federal Reserve. Holder may at any time pledge or assign all or any portion of its rights under the loan documents, which evidence and/or secure the Loan, including any portion of this Note, to any of the twelve (12) Federal Reserve Banks organized under Section 4 of the Federal Reserve Act, 12 U.S.C. Section 341. No such pledge or assignment or enforcement thereof shall release Holder from its obligations under any of the loan documents, which evidence and/or secure the Loan.

DocuSign Envelope ID: 86420FC2-52AE-43F6-9F0F-453C00216480

Section 16. <u>Right of Setoff</u>. Maker hereby grants to Holder, a continuing lien, security interest and right of setoff as security for all liabilities and obligations to Holder whether now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of Holder or any entity under the common control of Holder, and their respective successors and/or assigns, or in transit to any of them. At any time, without demand or notice (any such notice being expressly waived by Maker), Holder may setoff the same or any part thereof and apply the same to any liability or obligation of Maker even though unmatured and regardless of the adequacy of any other collateral security for the Loan which is evidenced by this Note. **ANY AND ALL RIGHTS TO REQUIRE LENDER TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE LOAN WHICH IS EVIDENCED BY THIS NOTE PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF THE MAKER OR ANY GUARANTOR, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.**

Section 17. <u>Governing Law</u>. This Note and its validity, enforcement and interpretation shall be governed by the laws of the State of Florida (without regard to any principles of conflicts of laws) and applicable United States federal law.

Section 18. <u>Waiver of Jury Trial</u>. **MAKER AND LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE OR ANY OTHER LOAN DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY, INCLUDING, WITHOUT LIMITATION, ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS OR ACTIONS OF LENDER RELATING TO THE ADMINISTRATION OF THE LOAN EVIDENCED BY THIS NOTE OR ENFORCEMENT OF THE LOAN DOCUMENTS EVIDENCING AND/OR SECURING THE LOAN, AND AGREE THAT NEITHER PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. EXCEPT AS PROHIBITED BY LAW, MAKER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. MAKER CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER. THIS WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR LENDER TO ACCEPT THIS NOTE AND MAKE THE LOAN.**

Section 19. <u>Venue; Jurisdiction</u>. **MAKER AGREES THAT ANY SUIT FOR THE ENFORCEMENT OF THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS MAY BE BROUGHT IN THE COURTS OF THE STATE OF FLORIDA LOCATED IN PINELLS OR MANATEE COUNTY OR UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA AND CONSENTS TO THE NONEXCLUSIVE JURISDICTION OF SUCH COURT. MAKER HEREBY WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH SUIT OR ANY SUCH COURT OR THAT SUCH SUIT IS BROUGHT IN AN INCONVENIENT FORUM.**

Section 20. <u>Obligations Joint and Several</u>. If Maker is comprised of more than one Person, the obligations of such Persons under this Note shall be joint and several.

Section 21. <u>Counterparts</u>. If this Note is to be executed by more than one Person, then this Note may be executed in one or more counterparts, each of which shall constitute an original and all of which, taken together, shall constitute one and the same instrument.

DocuSign Envelope ID: 86420FC2-52AE-43F6-9F0F-453C00216489

IN WITNESS WHEREOF, Maker has duly executed this Note as of the date first above written. EXHIBIT "B"

Maker:

LUX PHARMA HOLDINGS, LLC

By: _____

Name: Phil Neuman

Title: Member

DocuSign Envelope ID: 86420FC2-52AE-43F8-9F0F-453C00216489

# SCHEDULE OF COLLATERAL

**EXHIBIT "B"**

The Collateral includes, without limitation, the following:

"Collateral" means all of the assets and properties of the Maker, including (without limitation) each of the following, in each case whether now or later acquired, created or otherwise existing (including without limitation during the pendency of any bankruptcy proceeding) and wherever located:

(i) All Receivables of the Maker;

(ii) All Inventory, equipment and other goods of the Maker, wherever located, including (without limitation) all (i) raw materials, work-in-progress and finished goods, (ii) documents, warehouse receipts, bills of lading and other documents of title now or covering any such goods, and (iii) accessions, accessories, additions, attachments, equipment, fixtures, furnishings, goods, machinery, materials, parts, replacements, supplies, tools and vehicles, whether or not located upon or affixed to any of the foregoing;

(iii) All Intellectual Property of the Maker;

(iv) All of the real property, leases and other real estate of the Maker described in the mortgages, all fixtures and improvements thereto, and all interests, wherever located, including (without limitation) all of the property;

(v) All (i) investments of the Maker, including (without limitation) any investment(s) in or to or issued by any subsidiary or affiliate of the Maker, (ii) all dividends, interest and distributions on, under or related to any of the foregoing items (whether cash, stock or otherwise) and splits and reclassifications thereof, (iii) all options, warrants and other rights to acquire any such investments, and (iv) all security entitlements and other rights, powers, privileges, remedies and interests of the referenced person in, to and under all the foregoing and all organizational documents and custody documents pertaining thereto;

(vi) All (i) advances, loans and other debts and amounts (including interest) directly or indirectly owed to the Maker by any surety, (ii) subrogation, contribution and other similar rights of the Maker against or regarding any surety, or any of its assets and properties, whether resulting from any payment made by the Maker or otherwise, and (iii) liens or credit support and other supporting obligations (as defined in the UCC) for any such advances, loans, indebtedness, amounts or rights, and (iv) security entitlements and other rights, powers, privileges, remedies and interests of the Maker in, to or under any of the foregoing and any other note, overdraft facility agreement, letter of credit application, guaranty, security agreement, hypothecation, assignment, mortgage or other instrument, agreement or document with or issued or given to the Maker creating, evidencing, governing, supporting, securing, perfecting or respecting (in whole or in part) any such advances, loans, debts, amounts or rights;

(vii) All Receivables of the Maker, all other accounts, instruments, chattel paper, documents of title and trust receipts (and the goods covered, wherever located), financial assets, investment property, security entitlements, contract rights, warranties, casualty and other insurance policies and rights, litigation claims and rights, commercial tort claims, trade names, farm products, payment intangibles and other general intangibles of the Maker, and all computer programming data and other books and records of the Maker, in each case arising from or regarding all or any part of any of the items in the foregoing subsections; and

(viii) All deposit accounts and other deposits of the Maker (whether general or special, time or demand, provisional or final, or individual or joint) maintained with the Secured Party or any of its affiliates, custodians, participants or designees; all indebtedness and other amounts and obligations owing by the Secured Party or any of its affiliates or participants to or for the credit, account or benefit of the Maker; and all assets and properties of the Maker in the possession, custody or control of the Secured Party, or any of the Secured Party's affiliates, custodians, participants or designees, including (without limitation) other monies, certificates of deposit, securities, instruments of debt or credit, documents of title and trust receipts (and the goods covered, wherever located), and other instruments and documents;

(ix) Whether now or later acquired or created, whether owned beneficially or of record and whether owned individually, jointly or otherwise, with the products and proceeds thereof, all collections, payments and other distributions and realizations with respect thereto, all other rights, powers, privileges, remedies and interests of the Maker, thereto or thereunder, and all renewals, substitutions, modifications and extensions of all of the

DocuSign Envelope ID: 86420FC2-52AE-43F6-9F0F-453C00210489

items in the foregoing subsections (the foregoing items will be referred to collectively as the "Collateral"), as security for the timely and full payment and satisfaction of the Obligations as and when due. (The Maker acknowledges that the reference to all real estate in paragraph (iv) above serves as a covenant to deliver future mortgages on additional real estate of the Maker as and if acquired.)

"Intellectual Property" will mean all copyrights and copyrighted materials, logos, patents, service marks, trademarks, trade names, domain names, advertisements and other promotional materials (whether or not copyrighted), know-how, designs, discoveries, formulae, ideas, inventions, products, programs, computer programs and other software and firmware (whether in source code, object code or otherwise, including all "shrinkwrap" licenses that accompanied any item of equipment or software when obtained), specifications, styles, techniques and other trade secrets, works of authorship and other intellectual properties of the referenced person, including (without limitation) all applications, invention disclosures and pending items, all license royalties and other payment intangibles, the proceeds of infringement suits and other proceeds, the right to sue for past, present and future infringement, all rights corresponding thereto throughout the world and all reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof, and, in the case of trademarks, the goodwill of the business to which each relates, in each case (a) whether now or later acquired, created, developed, executed, held, licensed, modified, owned or otherwise existing (including without limitation during the pendency of any bankruptcy proceeding), (b) whether acquired, created, developed, executed, held, licensed, modified or owned (i) beneficially or of record and (ii) individually, jointly or otherwise, and (c) irrespective of whether any patent, copyright, trademark or other right or protection has been or can be sought, issued or obtained in connection therewith.

"Inventory" means all goods, merchandise, and other personal property now owned or later acquired by Maker held for sale or lease, or are furnished or to be furnished under any contract of service or are raw materials, work in process, supplies or materials used or consumed in Maker's business, and all products thereof, and substitutions, replacements, additions, or accessions thereto.

"Receivables" means all accounts, contract rights, instruments, documents, chattel paper, general intangibles (including, without limitation, choses in action, tax refunds, and insurance proceeds); any other obligations or indebtedness owed to Maker from whatever source arising; all rights of Maker to receive any payments in money or kind; and all of the foregoing, whether now existing or later created or later acquired.

EXHIBIT "B"

ALLONGE

On October 6, 2020, the principal amount of the Secured Promissory Note dated August 14, 2020 and attached as Exhibit A hereto will be and its pay-off amount is amended to $165,525.87 and that amount is not subject to any adjustments. The Note is fully due and payable on December 7, 2020.

"MAKER"

LUX PHARMA HOLDINGS, LLC

By: _____

Name: Phil Neuman

Title: Member

Date: October 6, 2020

"HOLDER"

YVONNE OKEKE

By: Yvonne Okeke

Name: _____

Title: _____

Date: 10 7 2020

DocuSign Envelope ID: 86420FC2-52AE-43F0-9F0F-453C00216489

EXHIBIT "C"

SECURITY AGREEMENT

This Security Agreement, dated as of August 14, 2020 (this "Agreement"), by the undersigned (the "Debtor") in favor of YVONNE OKEKE (the "Secured Party").

Reference is made to that certain Membership Interest Purchase Agreement dated as of August 10, 2020, among YVONNE OKEKE ("Seller"), YVONNE ENTERPRISES LLC, a Florida limited liability company D/B/A KAY PHARMACY ("Company") and LUX PHARMA HOLDINGS, LLC, a limited liability company ("Buyer") (the "Purchase Agreement"). Unless otherwise defined herein, terms defined in the Purchase Agreement and used herein shall have the meanings given to them in the Purchase Agreement. Unless otherwise defined in this Agreement or in the Purchase Agreement, terms defined in Article 8 or 9 of the UCC are used in this Agreement as such terms are therein defined.

1. For valuable consideration, and to secure the payment and performance of the obligations hereinafter described, Debtor hereby grants to Secured Party, a security interest in the items described in <u>Exhibit A</u>, attached hereto and incorporated herein by this reference, together with all present and future accessories, additions, attachments, proceeds, products, replacements and substitutions of or to all of the foregoing, now owned or at any time hereafter acquired and wherever located (collectively referred to as the "Collateral").

2. This Agreement and the security interest created hereby are given for the purpose of securing: (a) payment of the indebtedness evidenced by the Purchase Agreement; (b) performance of each agreement of Debtor herein contained; (c) payment and performance of all existing and future obligations of Debtor to Secured Party; and (d) any and all amendments, modifications, renewals and/or extensions of any of the foregoing, including, but not limited to, amendments, modifications, renewals or extensions which are evidenced by new or additional instruments, documents or agreements or which change the rate of interest on any obligations secured hereby. It is the express purpose of Debtor and Secured Party that all obligations of Debtor to Secured Party shall be subject to Secured Party's security interest in the Collateral, regardless of whether such obligations shall be of the same class as the obligations initially contemplated at the time this transaction was entered into.

3. Debtor represents, warrants and agrees that: (a) Debtor has full title to the Collateral, free from any liens, leases, encumbrances, defenses or other claims; the security interest in the Collateral constitutes a first, prior and indefeasible security interest; and no financing statement covering the Collateral, or any part thereof, is on file in any public office; (b) Debtor will execute all documents (including financing statements) and take such other action as Secured Party deems necessary to create and perfect a security interest in the Collateral; (c) Debtor will, at its sole cost and expense, defend any claims that may be made against the Collateral; (d) except as otherwise provided herein, the Collateral shall be kept at Debtor's address set forth herein and Debtor will not, without Secured Party's prior written consent, part with possession of, transfer, sell, lease, encumber, conceal or otherwise dispose of the Collateral or any interest therein; (e) the Collateral will be maintained in good condition and repair, and will not be used in violation of any applicable laws, rules or regulations; (f) Debtor will pay and discharge all taxes and liens on the Collateral prior to delinquency; (g) Debtor will maintain insurance on the Collateral covering such risks and in such form and amount as may be required by Secured Party from time to time, with insurers satisfactory to Secured Party and with loss payable to Secured Party as its interest may appear, and upon request Debtor will deliver the original of such policy or policies to Secured Party; (h) Debtor will permit Secured Party to inspect the Collateral and Debtor's books and records (including computer files) pertaining thereto at any time; and (i) the Collateral will at all times remain personal property.

4. In the event that Debtor shall fail to perform any obligation hereunder, Secured Party may, but shall not be obligated to, perform the same, and the cost thereof shall be payable by Debtor to Secured Party immediately and without demand.

DocuSign Envelope ID: 86420FC2-52AE-43F6-9F0F-453C00216489

EXHIBIT "C"

5. If this Agreement is given to secure obligations of any person or entity other than Debtor (such person or entity being hereinafter referred to as "Principal"), Debtor waives notice of default, presentment, demand for payment, protest, notice of protest, notice of nonpayment or dishonor, and all other notices and demands of any kind whatsoever; and Debtor consents and agrees that Secured Party may, from time to time, without notice or demand and without affecting the enforceability or security hereof: (a) take, alter, enforce or release any additional security for the obligations secured hereby; (b) renew, extend, modify, amend, accelerate, accept partial payments on, release, settle, compromise, compound, collect or otherwise liquidate the obligations secured hereby or any security therefor, and bid and purchase at any sale; or (c) release or substitute Principal or any guarantors of the obligations secured hereby. If any default should be made in the payment or performance of any obligations secured hereby or in the terms and conditions of any security held therefor, Secured Party may enforce this Agreement independently of any other remedy or security Secured Party may at any time hold in connection with the obligations secured hereby, and it shall not be necessary for Secured Party to proceed upon or against, and/or exhaust, any other security or remedy before proceeding to enforce this Agreement. Until all obligations secured hereby are paid in full, Debtor waives all right of subrogation.

6. There shall be a "default" or an "event of default" hereunder upon the occurrence of any of the following events: (a) default in the payment or performance of any obligations secured hereby or contained herein; or (b) occurrence of any "default" or "event of default" under any note or other obligation secured hereby or any security therefor.

7. Upon the occurrence of any event of default, all obligations secured hereby shall, at Secured Party's option, immediately become due and payable without notice or demand, and Secured Party shall have in any jurisdiction where enforcement hereof is sought, in addition to all other rights and remedies which Secured Party may have under law, all rights and remedies of a secured party under the Uniform Commercial Code and in addition the following rights and remedies , all of which may be exercised with or without further notice to Debtor: (a) to settle, compromise or release on terms acceptable to Secured Party, in whole or in part, any amounts owing on the Collateral; (b) to enforce payment and prosecute any action or proceeding with respect to any and all of the Collateral; (c) to extend the time of payment, make allowances and adjustments and issue credits in Secured Party's name or in the name of Debtor; (d) to foreclose the liens and security interests created under this Agreement or under any other agreement relating to the Collateral by any available judicial procedure or without judicial process; (e) to enter any premises where any Collateral may be located for the purpose of taking possession of or removing the same; (f) to remove from any premises where the same may be located the collateral and any and all documents instruments, files and records, and any receptacles and cabinets containing the same, relating to the Collateral, and Secured Party may, at Debtor's cost and expense, use the supplies and space of Debtor at any or all of its places of business as may be necessary or appropriate to properly administer and control the Collateral or the handling of collections and realizations thereon; (g) to receive, open and dispose of all mail addressed to Debtor and notify postal authorities to change the address for delivery thereof to such address as Secured Party may designate; (h) to sell, assign, lease, or otherwise dispose of the Collateral or any part thereof, either at public or private sale, in lots or in bulk, for cash, on credit or otherwise, with or without representations or warranties, and upon such terms as shall be acceptable to Secured Party, all at Secured Party's sole option and as Secured Party in its sole discretion may deem advisable. The net cash proceeds resulting from the collection, liquidation, sale, lease or other disposition of the Collateral shall be applied, first, to the expenses (including all attorneys' fees) of retaking, holding, storing, processing and preparing for sale, selling, collecting, liquidating and the like, and then to the satisfaction of all obligations and indebtedness or against principal or interest to be in Secured Party's absolute discretion. Debtor will, at Secured Party's request, assemble all Collateral and make it available to Secured Party at such place or places as Secured Party may designate which are reasonably convenient to both parties, whether at the premises of Debtor or elsewhere, and will make available to Secured Party all premises and facilities of Debtor for the purpose of Secured Party's taking possession of the

DocuSign Envelope ID: 88420FC2-52AE-43F8-9F0F-453C00216489

**EXHIBIT "C"**

Collateral or removing or putting the Collateral in saleable form. Debtor agrees to pay all costs and expenses incurred by Secured Party in the enforcement of this Agreement, including without limitation reasonable attorneys' fees, whether or not suit is filed hereon.

8. This Agreement expresses the entire understanding of the parties hereto and may not be altered or amended except with the written consent of each of the parties. This Agreement shall be binding upon and inure to the benefit of the respective heirs, executors, administrators, assigns and successors of the parties hereto. All of Secured Party's rights and remedies hereunder are cumulative and not exclusive, and are in addition to all rights and remedies provided by law or under any other agreement between Debtor and Secured Party, or otherwise. Where the context permits, the plural term shall include the singular, and vice versa. Where more than one person signs this Agreement, their obligations hereunder shall be joint and several.

9. This Agreement and your rights and obligations hereunder will be governed by and construed in accordance with the laws of the State of Florida. We agree that any legal action or proceeding with respect to this Agreement may be brought in either the courts of the State of Florida or the courts of the United States of America having jurisdiction over Hillsborough County. For the purpose of any such legal action or proceeding, we hereby submit to the exclusive jurisdiction of such courts and agree not to raise and waive any objection we may have based upon the venue of any such court. We further agree: (1) not to bring any legal action or proceeding referred in connection with this Agreement in any other court, unless the courts of the State of Florida or of the United States determine that they do not have jurisdiction in the matter; and (2) to waive any limitation on the time within which an action or proceeding may be brought under or with respect to this Agreement.

10. WE HEREBY WAIVE, AND COVENANT THAT WE WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, SUIT, ACTION OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE SUBJECT MATTER HEREOF, ANY LOAN DOCUMENT, OR ANY OF OUR OBLIGATIONS, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING OR WHETHER IN CONTRACT, IN TORT OR OTHERWISE.

DocuSign Envelope ID: 86420FC2-52AE-43F0-9F0F-453C00216489

EXHIBIT "C"

LUX PHARMA HOLDINGS, LLC

By: _____

Name: Phil Neuman

Title: Member

AGREED AND ACCEPTED:

_____

YVONNE OKEKE

DocuSign Envelope ID: 85420FC2-52AE-43F6-9F0F-453C00216489

EXHIBIT "C"

# EXHIBIT A. DESCRIPTION OF COLLATERAL.

The Collateral includes, without limitation, the following:

"Collateral" means all of the assets and properties of the Borrower, including (without limitation) each of the following, in each case whether now or later acquired, created or otherwise existing (including without limitation during the pendency of any bankruptcy proceeding) and wherever located:

(i)   All Receivables of the Borrower;

(ii)   All Inventory, equipment and other goods of the Borrower, wherever located, including (without limitation) all (i) raw materials, work-in-progress and finished goods, (ii) documents, warehouse receipts, bills of lading and other documents of title now or covering any such goods, and (iii) accessions, accessories, additions, attachments, equipment, fixtures, furnishings, goods, machinery, materials, parts, replacements, supplies, tools and vehicles, whether or not located upon or affixed to any of the foregoing;

(iii)   All Intellectual Property of the Borrower;

(iv)   All of the real property, leases and other real estate of the Borrower described in the mortgages, all fixtures and improvements thereto, and all interests, wherever located, including (without limitation) all of the property;

(v)   All (i) investments of the Borrower, including (without limitation) any investment(s) in or to or issued by any subsidiary or affiliate of the Borrower, (ii) all dividends, interest and distributions on, under or related to any of the foregoing items (whether cash, stock or otherwise) and splits and reclassifications thereof, (iii) all options, warrants and other rights to acquire any such investments, and (iv) all security entitlements and other rights, powers, privileges, remedies and interests of the referenced person in, to and under all the foregoing and all organizational documents and custody documents pertaining thereto;

(vi)   All (i) advances, loans and other debts and amounts (including interest) directly or indirectly owed to the Borrower by any surety, (ii) subrogation, contribution and other similar rights of the Borrower against or regarding any surety, or any of its assets and properties, whether resulting from any payment made by the Borrower or otherwise, and (iii) liens or credit support and other supporting obligations (as defined in the UCC) for any such advances, loans, indebtedness, amounts or rights, and (iv) security entitlements and other rights, powers, privileges, remedies and interests of the Borrower in, to or under any of the foregoing and any other note, overdraft facility agreement, letter of credit application, guaranty, security agreement, hypothecation, assignment, mortgage or other instrument, agreement or document with or issued or given to the Borrower creating, evidencing, governing, supporting, securing, perfecting or respecting (in whole or in part) any such advances, loans, debts, amounts or rights;

(vii)   All Receivables of the Borrower, all other accounts, instruments, chattel paper, documents of title and trust receipts (and the goods covered, wherever located), financial assets, investment property, security entitlements, contract rights, warranties, casualty and other insurance policies and rights, litigation claims and rights, commercial tort claims, trade names, farm products, payment intangibles and other general intangibles of the Borrower, and all computer programming data and other books and records of the Borrower, in each case arising from or regarding all or any part of any of the items in the foregoing subsections; and

(viii)   All deposit accounts and other deposits of the Borrower (whether general or special, time or demand, provisional or final, or individual or joint) maintained with the Secured Party or any of its affiliates, custodians, participants or designees; all indebtedness and other amounts and obligations owing by the Secured Party or any of its affiliates or participants to or for the credit, account or benefit of the Borrower; and all assets and properties of the Borrower in the possession, custody or control of the Secured Party, or any of the Secured Party's affiliates, custodians, participants or designees, including (without limitation) other monies, certificates of deposit, securities, instruments of debt or credit, documents of title and trust receipts (and the goods covered, wherever located), and other instruments and documents;

Page 5

DocuSign Envelope ID: 88420FC2-52AE-43F8-8F0F-463C00216489

**EXHIBIT "C"**

(ix)   Whether now or later acquired or created, whether owned beneficially or of record and whether owned individually, jointly or otherwise, with the products and proceeds thereof, all collections, payments and other distributions and realizations with respect thereto, all other rights, powers, privileges, remedies and interests of the Borrower, thereto or thereunder, and all renewals, substitutions, modifications and extensions of all of the items in the foregoing subsections (the foregoing items will be referred to collectively as the "Collateral"), as security for the timely and full payment and satisfaction of the Obligations as and when due. (The Borrower acknowledges that the reference to all real estate in paragraph (iv) above serves as a covenant to deliver future mortgages on additional real estate of the Borrower as and if acquired.)

"Intellectual Property" will mean all copyrights and copyrighted materials, logos, patents, service marks, trademarks, trade names, domain names, advertisements and other promotional materials (whether or not copyrighted), know-how, designs, discoveries, formulae, ideas, inventions, products, programs, computer programs and other software and firmware (whether in source code, object code or otherwise, including all "shrinkwrap" licenses that accompanied any item of equipment or software when obtained), specifications, styles, techniques and other trade secrets, works of authorship and other intellectual properties of the referenced person, including (without limitation) all applications, invention disclosures and pending items, all license royalties and other payment intangibles, the proceeds of infringement suits and other proceeds, the right to sue for past, present and future infringement, all rights corresponding thereto throughout the world and all reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof, and, in the case of trademarks, the goodwill of the business to which each relates, in each case (a) whether now or later acquired, created, developed, executed, held, licensed, modified, owned or otherwise existing (including without limitation during the pendency of any bankruptcy proceeding), (b) whether acquired, created, developed, executed, held, licensed, modified or owned (i) beneficially or of record and (ii) individually, jointly or otherwise, and (c) irrespective of whether any patent, copyright, trademark or other right or protection has been or can be sought, issued or obtained in connection therewith.

"Inventory" means all goods, merchandise, and other personal property now owned or later acquired by Borrower held for sale or lease, or are furnished or to be furnished under any contract of service or are raw materials, work in process, supplies or materials used or consumed in Borrower's business, and all products thereof, and substitutions, replacements, additions, or accessions thereto.

"Receivables" means all accounts, contract rights, instruments, documents, chattel paper, general intangibles (including, without limitation, choses in action, tax refunds, and insurance proceeds); any other obligations or indebtedness owed to Borrower from whatever source arising; all rights of Borrower to receive any payments in money or kind; and all of the foregoing, whether now existing or later created or later acquired.

DocuSign Envelope ID: 86420FC2-52AE-43F6-9F0F-453C00216489

EXHIBIT "D"

# Membership Interest Pledge Agreement

August 14, 2020
YVONNE OKEKE
9780 N 56TH ST
SUITE D
TEMPLE TERRACE, FL 33617

Re: Pledge Agreement

Reference is made to that certain Membership Interest Purchase Agreement dated as of August 10, 2020, among YVONNE OKEKE ("Seller"), YVONNE ENTERPRISES LLC, a Florida limited liability company D/B/A KAY PHARMACY ("Company") and LUX PHARMA HOLDINGS, LLC, a limited liability company ("Buyer") (the "Purchase Agreement"). To secure the payment and performance of the obligations under the Purchase Agreement, LUX PHARMA HOLDINGS, LLC ("we" or "us") pledges a security interest in the Collateral (as defined below) to YVONNE OKEKE ("you"), pursuant to the terms of this letter agreement (this "Agreement").

Unless otherwise defined herein, terms defined in the Purchase Agreement and used herein shall have the meanings given to them in the Purchase Agreement. Unless otherwise defined in this Agreement or in the Purchase Agreement, terms defined in Article 8 or 9 of the UCC are used in this Agreement as such terms are therein defined.

To secure the performance of all obligations in your favor under the Purchase Agreement and each of the other Loan Documents, the undersigned hereby pledges to you, and grants you a security interest in and to: (1) 100% of the Membership Interests (the "Interests"), of YVONNE ENTERPRISES LLC; and (2) any other "Collateral" (as hereinafter defined) whether now owned or hereafter acquired by Pledgor, whether now or hereafter existing or arising and wherever located. The term "Collateral", as used in this Agreement, means the Interests and any cash, securities or other property paid or otherwise distributed on, with respect to, or in exchange for the Interests or any other Collateral as well as all of our rights and privileges with respect to such Collateral. If we receive such other Collateral, we will promptly deliver the same to you in the form received.

We hereby represent and warrant to you that: (1) we are the sole owner of the Interests; (2) the Interests constitute approximately 100 percent of the issued and outstanding Membership Interests of the YVONNE ENTERPRISES LLC, which is the only class of Membership Interest entitled to elect managers; (3) the Interests are validly issued in our name, fully paid and non-assessable and, except as described above, are not subject to any encumbrance, claim or right in favor of any party other than you under this Agreement; (4) this Agreement has been duly authorized and constitutes our legal, valid and binding obligation, enforceable against us in accordance with its terms; (5) no authorization, approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required either for the pledge by us of the Interests pursuant to this Agreement or for the execution, delivery or performance of this Agreement by us, or for your exercise of the rights provided for in this Agreement or the remedies in respect of the Interests pursuant to this Agreement; (6) the pledge of the Interests to you pursuant to this Agreement creates a valid and perfected first priority security interest in your favor in the Interests securing the performance of the Loan Documents and the payment of the Note; and (7) except as described above, there are no options, warrants, privileges or other rights outstanding pursuant to which any Membership Interest of the YVONNE ENTERPRISES LLC may be acquired.

On the date of this Agreement, we shall deliver to you all certificates or instruments representing or evidencing the Interests and any other Collateral, which shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to you. All such certificates or instruments shall be held by you pursuant hereto.

DocuSign Envelope ID: 86420FC2-52AE-43F6-9F0F-453C00216489

**EXHIBIT "D"**

We agree that we will not transfer, assign or encumber any of our rights in any of the Collateral except pursuant to this Agreement.

We will take such action and execute such additional documents as you may request in connection with this Agreement or to enforce your rights hereunder. If we fail to take any such action or execute any such document, we hereby authorize you to do so in our name and on our behalf. Upon payment or performance in full of all obligations secured hereby, you will, at our request and expense, reassign or transfer the Interests and Collateral to us.

You and your permitted successors and assigns will have all of the rights, powers and privileges of a secured party under the UCC in force and effect from time to time with respect to the security interest granted by this Agreement.

Upon the occurrence and during the continuance of any Event of Default under the Purchase Agreement, without notice to us: (a) you will be entitled to vote the Interests and any other Collateral held by you under this Agreement, and at all such times we will not be entitled to vote the Interests or any other Collateral and (b) you may take such action as you deem advisable with respect to the Collateral, including, without limitation, transferring any of the Collateral into your name or the name of your nominee, and selling any of the Collateral at a public or private sale on such terms as you deem appropriate. At any such sale you may be the purchaser.

You will not be required to resort to or pursue any of your rights or remedies under or with respect to any other security for, or guaranty of payment of, any of the obligations secured by this Agreement before pursuing any of your rights or remedies under this Agreement.

We hereby waive any and all defenses, whether statutory or decisional, to the enforcement of this Agreement arising by virtue of that fact, including, without limitation, any defenses regarding the exoneration or discharge of sureties provided by law. Without limiting the generality of the foregoing, we agree that our obligations hereunder will not be affected by your failure to assert any claim or demand or to enforce any right or remedy against Debtor under the provisions of any Loan Document, under any extension or renewal of any provision thereof, or under any rescission, waiver, amendment or modification of any of the terms or provisions of any Loan Document.

Similarly, our obligations hereunder will not be affected by: your failure to perfect any security interest in any other security held by you for any of the Obligations; your failure to exercise any right or remedy against any other guarantor or accommodation pledgor of any of the Obligations; your taking and holding security or collateral for the payment of any other guaranties of Obligations and your exchanging, enforcing, waiving and releasing any such security or collateral; your applying such security or collateral and directing the order or manner of sale thereof as you, in your discretion, may determine; your settling, releasing, compromising, collecting or otherwise liquidating the Obligations and any security or collateral therefor in any manner, as you may determine; or any default, failure or delay, or any other act or thing, that might, in any manner or to any extent, vary our risk hereunder or which would otherwise operate to discharge us as a matter of law or equity.

This Agreement shall be binding upon the heirs, executors, administrators, successors and assigns of the undersigned. You and your permitted successors and assigns will have all of the rights, powers and privileges of a secured party under the UCC in force and effect from time to time with respect to the security interest granted by this Agreement.

This Agreement and your rights and obligations hereunder will be governed by and construed in accordance with the laws of the State of Florida. We agree that any legal action or proceeding with respect to this Agreement may be brought in either the courts of the State of Florida or the courts of the United States of America, having jurisdiction over Hillsborough County. For the purpose of any such legal action or proceeding, we hereby submit to the exclusive jurisdiction of such courts and agree not to raise and waive any objection we may have based upon the venue of any such court. We further agree that: (1) not to bring any legal action or proceeding referred in

DocuSign Envelope ID: 8B420FC2-52AE-43F6-8F0F-4B3CC0021649B

connection with this Agreement in any other court, unless the courts of or of of the United States determine that they do not have jurisdiction in the matter; and (2) to waive any limitation on the time within which an action or proceeding may be brought under or with respect to this Agreement.

WE HEREBY WAIVE, AND COVENANT THAT THAT WE WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, SUIT, ACTION OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE SUBJECT MATTER HEREOF, ANY LOAN DOCUMENT, OR ANY OF OUR OBLIGATIONS, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING OR WHETHER IN CONTRACT, IN TORT OR OTHERWISE.

If the foregoing is acceptable to you, please sign the enclosed copy of this letter in the space provided below, whereupon this letter will become an agreement between us as of the date first above written.

Very truly yours,

LUX PHARMA HOLDINGS, LLC

By: _____
Name: Phil Neuman
Title: Member

AGREED AND ACCEPTED:

_____
YVONNE OKEKE

EXHIBIT "D"

EXHIBIT "E"

### BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS, that YVONNE OKEKE, party of the first part and owner of 100% of the membership interest in YVONNE ENTERPRISES, LLC., a Florida limited liability company, d/b/a KAY PHARMACY in consideration of the sum of Five Hundred and Fifty Thousand and NO/100 ($540,000.00) Dollars, of which Three Hundred Seventy Four Thousand Four Hundred Seventy Four and 13/100 ($374,474.13) Dollars is in lawful money of the United States and a Promissory Note for the remainder, One Hundred Sixty Five Thousand Five Hundred Twenty Five and 87/100 ($165,525.87) Dollars, paid to him/her/them by LUX PHARMA HOLDINGS, LLC, a Wyoming limited liability company and party for the second part, the receipt of both the lawful money of the United States and the Promissory Note is hereby acknowledged, has/have granted, bargained, sold, transferred and delivered, and by these presents does/do grant, bargain, sell, transfer and deliver unto the said party of the second part, his/her/their executors, administrators, and assigns, as of October 7, 2020, the following goods and chattels:

One Hundred Percent (100%) of the membership interest in and to YVONNE ENTERPRISES, LLC., a Florida limited liability company, d/b/a KAY PHARMACY, a Florida limited liability company.

TO HAVE AND TO HOLD the same unto the said party of the second part, his/her/their executors, administrators, and assigns forever.

AND I/we do, for ourselves, heirs, executors and administrators, covenant to and with the said party of the second part, his/her/their executors, administrators, covenant to and with the said party of the second part, our executors, administrators, and assigns, that we are lawful owners of the said goods and chattels; that they are free from all encumbrances; that we have good right to sell the same aforesaid, and that we will warrant and defend the sale of the said property, goods and chattels hereby made, unto the said party of the second part, our executors, administrators and assigns against the lawful claims and demands of all person whomsoever.

IN WITNESS WHEREOF, I/We have hereunto set my/our hand and seal this October 7, 2020.

Signed sealed and delivered in the presence of:

SELLER:

By: _____
Yvonne Okeke, individually

Witness:

_____

BUYER:
LUX PHARMA HOLDINGS, LLC

By: _____
Phil Neuman, member

Witness:

_____